**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 26, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

AMANDA ADDISON, a/k/a Amanda Ortiz,

Defendant-Appellant.

No. 11-8105

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:11-CR-00018-ABJ-3)**

Kerry J. Jacobson, Assistant United States Attorney, District of Wyoming, Lander, Wyoming, (Christopher A. Crofts, United States Attorney, District of Wyoming, Cheyenne, Wyoming, with her on the brief) for Plaintiff-Appellee

Thomas A. Fleener, Fleener & Vang, LLC, Laramie, Wyoming, for Defendant-Appellant

Before **O'BRIEN**, **MURPHY**, and **TYMKOVICH**, Circuit Judges.

**O'BRIEN**, Circuit Judge.

Amanda Addison[1] and Melody St. Clair were on trial for embezzling or converting funds from the Northern Arapahoe Tribe's Department of Social Services (DSS). On July 7, 2011, the third day of trial, the trial judge declared a mistrial as to St. Clair only and excluded her from the courtroom for the remainder of the trial. Addison was convicted. She brings two issues for our consideration, whether: (1) the exclusion of St. Clair violated Addison's Sixth Amendment right to a public trial and (2) the evidence was sufficient to demonstrate criminal intent. Because the district court had a substantial reason for excluding St. Clair, no Sixth Amendment violation occurred. The evidence was sufficient to prove her knowing and intentional taking of DSS funds. We affirm.

## I. FACTUAL BACKGROUND

We recite the facts in the light most favorable to the jury's verdict. *See United States v. Pablo*, 696 F.3d 1280, 1284 n.5 (10th Cir. 2012). The Northern Arapahoe Tribe is a federally recognized Indian tribe located on the Wind River Indian Reservation in Wyoming; Addison is a member. In 2005, she began working as a payroll clerk for DSS, which provides welfare assistance to tribal members and their families. Her job duties included inputting DSS employees' time card information into the payroll system and processing their payroll checks. At that time, George Moss was the Executive Director of DSS. St. Clair was the Finance Administrator and Addison's direct supervisor.

---

[1] Addison has remarried since the time of the offense and is now Amanda Ortiz.

Each year, the Tribe receives in excess of $10,000 for its operations. DSS is completely funded by federal government money kept separate from the Tribe's general funds. Because of their federal nature, restrictions have been placed on the use of DSS funds. Relevant here, the money could not be used for pay advances or employee loans.[2] Nevertheless, shortly after beginning her employment with DSS, Addison, along with St. Clair, began issuing checks to themselves from the DSS account for forbidden uses. Their "advances" and "loans" far exceeded their salaries. Moss, who was the only DSS employee with authority to do so, signed the checks. According to his testimony Addison and/or St. Clair would bring checks for him to sign; he would ask if the checks were in order and relied on their invariably affirmative answers. He also pre-signed checks to be used when he was not in the office. He was aware of the restrictions placed on DSS funds, but signed the checks, claiming to believe they were for agency use.[3]

---

[2] Tribal funds could be used for those purposes, and, indeed, tribal policy permitted its employees to receive advances and loans. Pay advances were only to be given to cover medical, funeral or official travel expenses, were limited to one $300 advance per calendar quarter, and were to be repaid by the next bi-weekly pay period. If an advance was not timely repaid, it was reclassified as an employee loan. Such loans were capped at $1,000 and were to be repaid within one year with interest at 15%. The limits and caps, however, were largely ignored and the Tribe's efforts to collect were poor. By the end of December 2006, the Tribe had advanced or loaned $890,000 to 480 of its employees, the bulk of which went to 46 employees. While the policy is not unlawful (to the extent it involved the Tribe's own funds), it was not economically prudent because the Tribe had insufficient financial resources to cover the advances and loans. In mid-2006, based on the recommendations of its auditors, the Tribe issued a moratorium on all pay advances and employee loans.

[3] Moss's expansive interpretation of "agency use" included anything "tied in with the agency in some way." (R. Vol. 3, Pt. 3 at 674.) Thus, for example, he believed

Addison was interviewed by federal agents. She admitted issuing checks drawn on DSS funds to herself, but claimed to be unaware of the money's federal character and of the tribal policy concerning pay advances and employee loans. *See supra* n.2. She claimed such advances and loans were "very common" in DSS and "if an employee wanted one, he or she would get one." (R. Vol. 3, Pt. 4 at 819.) She originally claimed to have taken the money because her then husband used her paycheck for drinking and gambling and she needed to cover household expenses. However, later in the interview, she admitted to having used the money to gamble. She also told the agents she did not believe her actions were illegal at the time she was taking the money but admitted it "felt . . . wrong," she "felt sick about it," and "she had . . . taken advantage of the situation" because "it was easy." (R. Vol. 3, Pt. 4 at 820, 822.) When asked whether, in retrospect, her conduct looked like theft, she said yes.

Addison and St. Clair received over $140,000 in employee advances and loans; Addison's share was over $80,000. In order to avoid a loss of federal funding, the Tribe repaid the DSS account for the amounts taken by Addison and St. Clair and transferred their outstanding balances to the Tribe's books. The short-term result of their actions was a temporary suspension of DSS operations due to lack of funds. There was also a long-term effect: DSS no longer receives federal funds in advance; it must seek reimbursement from the federal government for expenditures.

---

allowing employees to obtain DSS funds to repair a vehicle constituted an "agency use" because it allowed them to get to work.

## II. PROCEDURAL BACKGROUND

Addison was indicted, along with Moss and St. Clair, for conspiracy to embezzle or convert monies from an organization receiving federal funds in violation of 18 U.S.C. § 371 and embezzlement or conversion of monies from an organization receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(A). Moss pled guilty to the embezzlement/conversion charge. Addison and St. Clair went to trial. On the third day of their joint trial, during the government's case-in-chief, counsel for St. Clair informed the court he had a potential conflict of interest with one of the government's witnesses, Marliss Quiver. He had represented her in a 1994 criminal prosecution for misuse of funds. Her expected testimony related to the amount of Addison and St. Clair's advances and loans. She would also testify about St. Clair's intimidation of her. St. Clair had an interest in impeaching her, particularly in regard to her probable witness intimidation testimony. Since Quiver's veracity would be critical, St. Clair's counsel would be required to expose her prior conviction. However, given Quiver's status as a former client, counsel felt he could not ethically cross-examine or impeach her. Given these circumstances, the judge *sua sponte* declared a mistrial as to St. Clair only and allowed the trial to proceed against Addison.[4]

The judge explained the conflict to St. Clair and his decision to declare a mistrial. In so doing, he refrained from making any findings as to the legitimacy of Quiver's

---

[4] The correctness of counsel's position or the judge's response is not at issue.

witness intimidation claims.  However, he told St. Clair any witness intimidation would be considered an obstruction of justice, itself an indictable offense, and directed her not to communicate directly or indirectly (i.e., through family or friends) with any witnesses. After the mistrial was declared, St. Clair's counsel asked if she would be allowed to remain and watch the proceedings.  The judge said no.  He viewed her as any other witness who has an interest in the case and considered it to be inappropriate to have her present.  Addison objected, claiming her Sixth Amendment right to a public trial would be violated by St. Clair's exclusion from the trial.  The government maintained the exclusion was proper because St. Clair could potentially be a witness in her own case involving the same conduct.  Thus, it claimed, allowing her to observe Addison's trial and thereby preview the evidence against her would impermissibly permit her to adjust her testimony in her own trial.  The judge denied Addison's objection, saying St. Clair was "an indictable co-defendant" and allowing  her to sit as a member of the audience in a trial where she was once a defendant, could distract the jury and be seen as a comment on her guilt or innocence.  (R. Vol. 3, Pt. 2 at 414, 415.)

After a brief recess, government counsel informed the judge (outside the presence of the jury) of a problem concerning the witness testifying just prior to the declaration of a mistrial, Rosella Morin.  Apparently, she was afraid of losing her job with the Tribe because she worked with some of Addison's relatives, who were in the courtroom.  The judge's further questioning revealed another basis for Morin's fear:  the wife of one of

the tribal business councilmen is related to St. Clair.[5]  The judge made one thing clear—

he would tolerate no obstruction of justice.  He used the situation as further support for

excluding St. Clair from the trial:

> And that's another reason why it would be intolerable to have Ms. St. [Clair] here.  . . . [F]or the Court to—especially in light of what this witness just said—and it's obvious that she's very tremulous about this.

> For me to allow a co-defendant to sit in this courtroom with family members and go out in the hallway and glare at people coming in and out of this courtroom—I wasn't born yesterday.  [Addison] has a right to a fair trial, but . . . no one has a right to obstruct justice, and it's clear that this witness is intimidated, and I'm not putting up with it.  And that further buttresses the Court's earlier ruling regarding the exclusion of [St. Clair] from the remainder of this proceeding.

> . . . .

> [W]hen I exclude a person who may engage in acts of witness intimidation, . . . that is not affecting [Addison's] right to a fair trial.  To the contrary, . . . it's probably guaranteeing that she gets it.

> . . . .

> I have an obligation to make sure that people get due process in this courtroom; that they get a fair trial; that there is no obstruction of justice, and my antennae are up.  The government has made representations as officers of the Court, and this witness clearly heightened this Court's concerns.  So that's the reason for the Court's ruling.  No one else is excluded.  The whole world is invited.

(R. Vol. 3, Pt. 2 at 421-23.)

---

[5]  The Business Council is the governing body elected to conduct the Tribe's business.  It has the power to hire and fire tribal employees.

Addison's trial proceeded.  The jury acquitted her of conspiracy but convicted on the embezzlement/conversion charge.  She was sentenced to 12 months and 1 day incarceration.

### III. DISCUSSION

A.  Sixth Amendment Right to Public Trial

Does the Sixth Amendment right to a public trial prohibit the exclusion of a particular member of the public?  We review the district court's factual findings for clear error, but the ultimate issue—whether the exclusion of St. Clair violated Addison's Sixth Amendment right to a public trial—is legal, requiring de novo review.  *United States v. Al-Smadi*, 15 F.3d 153, 154 (10th Cir. 1994).

Our analysis must begin with the words of the Constitution: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."  U.S. Const. amend. VI.  "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions."  *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (quotation marks omitted).  "[T]here is a strong societal interest in public trials.  Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously, and generally give the

public an opportunity to observe the judicial system." *Gannett Co. v. DePasquale*, 443 U.S. 368, 383 (1979).

While an accused enjoys the right to a public trial, the right is not absolute. *Waller*, 467 U.S. at 45; *United States v. Galloway (Galloway I)*, 937 F.2d 542, 545 (10th Cir. 1991). Where, as here, there is only a partial closure of the trial, the defendant's right gives way if there is a "substantial" reason for the partial closure. *Galloway I*, 937 F.2d at 546; *see also Nieto v. Sullivan*, 879 F.2d 743, 753 (10th Cir. 1989) (habeas corpus case) (defining total closure of courtroom as only allowing defendant, jury, judge and court staff to be present; closure was partial where only defendant's relatives were excluded from the courtroom during a witness's testimony). The trial judge must make findings sufficient for us to determine whether partial closure was proper. *Galloway I*, 937 F.2d at 546

No Sixth Amendment violation occurred here. While the court provided several reasons for excluding St. Clair, we need only focus on one—witness intimidation—because that interest alone is substantial. The government's attorney, an officer of the court, made a proffer saying Quiver—a government witness—had alleged St. Clair had intimidated her. The judge also heard directly from another witness, Morin, who testified to fear of losing her job in part because the wife of one of the Tribe's business councilmen is related to St. Clair. In the court's own words, Moran appeared "very tremulous" about testifying and was "clear[ly] . . . intimidated." (R. Vol. 3, Pt. 2 at 421.) Numerous courts, including our own, have upheld closure to protect testifying witnesses.

*See Nieto*, 879 F.2d at 752-54 (exclusion of defendant's relatives during victim's testimony did not violate the Sixth Amendment where victim was concerned for his safety given his two other assailants had yet to be apprehended and the defendant's brothers knew where he lived); *United States v. Galloway* (*Galloway II*), 963 F.2d 1388, 1390 (10th Cir. 1992) (approving partial closure of courtroom during victim's testimony due to victim's age and the sexual nature of the offense); *see also Martin v. Bissonette*, 118 F.3d 871, 875 (1st Cir. 1997) (closure of courtroom to all spectators, including defendant's mother, during key witness's testimony did not violate Sixth Amendment where witness had been intimidated by defendant, his girlfriend and his brothers); *Woods v. Kuhlmann*, 977 F.2d 74, 76-77 (2d Cir. 1992) (exclusion of defendant's family during eyewitness's testimony justified due to witness's fear for her safety after being threatened by defendant's family); *United States v. Hernandez*, 608 F.2d 741, 747-48 (9th Cir. 1979) (no Sixth Amendment violation where public excluded from courtroom during examination of witness who was in fear of his personal safety after being threatened). While the closure in these cases was limited to the duration of the witness's testimony, it was proper in this case for the court to exclude St. Clair from the entire trial because more than one witness complained of intimidation. Indeed, protecting the participants in a trial is an integral part of protecting the integrity of the trial itself. *Cf. United States v. Jackson*, 513 F.2d 456, 459 (D.C. Cir. 1975) (stating one purpose of statute criminalizing witness intimidation is "the protection of participants in federal judicial proceedings, and thereby the protection of the public interest in the due administration of justice");

*Broadbent v. United States*, 149 F.2d 580, 581 (10th Cir. 1945) (recognizing statute

prohibiting witness intimidation was "designed to protect witnesses in Federal courts and

to prevent a miscarriage of justice by corrupt methods").

St. Clair's exclusion did not undermine the interests protected by the Sixth

Amendment right to a public trial. *See Nieto*, 879 F.2d at 753 (considering the interests

protected by the Sixth Amendment in determining whether a violation occurred).

Because the courtroom was open to everyone but St. Clair, Addison was not at risk of

being treated unfairly or unjustly condemned.[6]

---

[6] In a total closure case, "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Waller*, 467 U.S. at 48.

At oral argument, Addison relied heavily on *Presley v. Georgia*, where the trial court excluded the lone observer, who was determined to be defendant's uncle, from jury voir dire because of insufficient seating space in the courtroom and the risk the jury would overhear prejudicial remarks by the defendant's family members. 558 U.S. 209, 130 S. Ct. 721, 722 (2010). The Supreme Court applied the *Waller* "overriding" interest test. *Id.* at 724-25. The closure in *Presley* only resulted in the exclusion of one person, but, the Court treated it as a total closure case; voir dire was closed to all members of the public, the closure just happened to affect only one individual. The *Presley* decision recognized the necessity of total closure in appropriate circumstances, but not on the record presented: "Nothing in the record shows that the trial court could not have accommodated the public at Presley's trial." *Id.* at 725.

Even were we to apply the stricter *Waller* (total closure) test to this case, it is satisfied: (1) preventing witness intimidation, thereby preserving the integrity of the trial, is an overriding interest which would be prejudiced if St. Clair were not excluded; (2) the closure was no broader than necessary to protect that interest as the court only closed the trial to the individual alleged to have engaged in witness intimidation and her exclusion from the entire trial was proper because there was evidence she intimidated more than one witness; (3) the court implicitly determined there were no reasonable alternatives to

- 11 -

B.  Sufficiency of the Evidence

Without objection the judge gave the following instruction with respect to the intent element:  "In order to find [Addison] guilty . . . you must find that the government proved  . . . beyond a reasonable doubt . . . that [she] did knowingly and intentionally steal, embezzle, or otherwise without authority knowingly convert, or intentionally misapply property" owned by or in the custody of DSS.  (R. Vol. 1 at 223.)  The jury was told "knowingly" means the defendant "was conscious and aware of her action, realized what she was doing or what was happening around her, and did not act because of ignorance, mistake or accident."  (*Id.* at 231.)  It was further instructed that as long as it found Addison "possessed the requisite intent, the authorization by a supervisor does not bar criminal prosecution."  (*Id.* at 233.)

Addison claims her conviction cannot stand because the government presented insufficient evidence of her knowledge and intent.  Elaborating, she argues the government failed to show she knew:  1) she was taking government funds and 2) the "advances" and "loans" were improper at the time of her actions. The first argument is easily resolved:  the government was not required to prove she knew the funds were federally derived.  Section 666(a)(1), (b) only requires the money taken be owned by or

exclusion as St. Clair's presence would likely intimidate witnesses; and (4) its findings adequately supported her exclusion.

Addison claims the denial of the right to a public trial guaranteed by the Sixth Amendment constitutes structural error not subject to harmless error review.  Because there was no Sixth Amendment violation, and consequently no need for harmless error review, the argument is misplaced.

- 12 -

under the custody and control of an entity receiving in excess of $10,000 a year in federal

funding. The uncontroverted evidence established DSS as such an entity.[7] Her second

argument requires some elaboration.

This case is about the reasonable inferences a jury might draw from the whole

body of evidence presented. Respect for the jury's fact-finding and ultimate verdict

restricts our review.

> We review sufficiency-of-the-evidence challenges de novo, considering both
> direct and circumstantial evidence, and all reasonable inferences therefrom, in the
> light most favorable to the government. We may not disturb the jury's credibility
> determinations, nor weigh the evidence in performing this analysis. The evidence
> is sufficient under these tests if a reasonable jury could have found the defendant
> guilty beyond a reasonable doubt.

*United States v. Acosta-Gallardo*, 656 F.3d 1109, 1123 (10th Cir.) (citations and

quotation marks omitted), *cert. denied*, 132 S. Ct. 540 (2011).

As we explain, the evidence at trial was sufficient to permit the inference,

apparently drawn by the jury, that Addison improperly, knowingly, and intentionally took

money belonging to or in the care of DSS. In summary: Addison wrote over seventy

checks to herself from DSS's account; these checks were in addition to her payroll checks

and far exceeded her annual salary of $23,000; she used the money to gamble; and her

admissions speak volumes—it "felt . . . wrong," she "felt sick about it," and "she had . . .

---

[7] Although unnecessary, there was evidence supporting a reasonable inference
that Addison knew the money she was taking was federally derived. According to Moss,
information concerning the federal regulations and the proper use of federal grant money
was disseminated to the DSS Finance Office. Several witnesses also testified to the
separate treatment of tribal funds and the federal money used to fund DSS.

taken advantage of the situation" because it was "easy." (Vol. 3, Pt. 4 at 820, 822.) Also looking at her conduct in retrospect, she admitted it resembled theft. But part of the government's case was circumstantial and there was contrary evidence with respect to the knowledge issue.

As is common in cases such as this, none of the government's witnesses testified to Addison's specific knowledge at the time of the offense—knowledge that taking advances and loans was improper. And Addison presented evidence of her "misunderstanding." She points to evidence demonstrating: (1) she received prior approval to take the advances and loans, (2) she was paying them back through payroll deductions, and (3) she never attempted to hide her actions. She also emphasizes the routine nature of tribal employees taking advances and loans. Addison testified to having the approval of either Moss or St. Clair for her "advances" and "loans."

But other evidence belied her claim of innocent taking. First, during her interview with federal agents, she said her requests to St. Clair for advances and loans were oral. According to Addison's trial testimony, however, St. Clair required requests to be in writing and she complied. No written requests were found. When asked to explain the discrepancy, Addison accused St. Clair of shredding the documentation. Second, Addison received a week suspension in November 2006 from St. Clair for, *inter alia*, preparing a pay advance without permission. So, she received at least one advance without permission. Third, in reconciling the Tribe's books, an auditor discovered four missing checks which had cleared the DSS account but which had not been logged into

DSS books. Copies of those checks were obtained from the bank; all four were issued to Addison. When the auditing firm had asked Addison for information concerning the missing checks, she claimed to have none. Finally, the evidence revealed checks issued to Addison were out of order even though Addison claimed the computer program used to process the payroll checks would not allow it. Given that Moss signed blank checks, to which, according to a co-worker's testimony, Addison had access, a jury could reasonably infer Addison used pre-signed checks to obtain funds without prior approval, thus resulting in checks being issued out of order.

Assuming Addison had permission to receive the "advances" and "loans," that permission would not absolve her from criminal liability. Moss was the only DSS employee with authority to sign checks from the DSS account. Addison admitted Moss was not a good manager and signed every check she asked him to sign upon her affirmation that the checks were in order. Moss's testimony confirmed this. In short, she knew any "permission" she received from Moss was illusory.

Addison did not hide her actions in that the amounts of her advances and loans, as well as her year-to-date totals, were contained on her pay stub. But there was no need to hide her actions as there was no effective oversight. Moss was, at best, a poor manager. And St. Clair was taking similar amounts of money.[8]

---

[8] Addison relies on *United States v. Oldbear*, where Oldbear argued, unsuccessfully, the evidence was insufficient to prove she had the requisite intent for commission of the crime of embezzlement under 18 U.S.C. § 1163. 568 F.3d 814, 823

Addison claims she was repaying the amounts she took through payroll deductions.  But the evidence showed the interest alone exceeded the payments being made; the "loans" would never be repaid.  Moreover, as the payments (payroll deductions) were being made, even more money was being taken improperly.  According to one of the Tribe's auditors, it appeared the balances were being paid with new advances and loans.  A jury could reasonably infer that Addison was making nominal payments only for the sake of appearances.  Also, the last payment Addison made on the balance was on August 5, 2008.  It was a payroll deduction from her last payroll check before she was laid off.  While she was adamant in trial testimony that she was going to pay off her balance, she had made no payment, not even a token one, in three years.

Advances and loans were commonplace on the reservation.  However, if an "everyone is doing it" defense ever works, it does not work here for at least two reasons.  First, most of the other advances and loans were funded with tribal money, not federal money.  Second, Addison and St. Clair's balances far exceeded those given to other employees.

---

(10th Cir. 2009).  We concluded (1) the fact she used her son's name to obtain funds from the tribe to repair her vehicle and (2) gave her son the new car she purchased with tribal funds to avoid the suspicion of her fellow tribe members, demonstrated the requisite intent. *Id.* at 824.  Addison argues this case is different because she, unlike *Oldbear*, did not engage in deception in taking the advances and loans.  Addison's failure to engage in deception is one fact bearing upon guilty knowledge, but not the only fact.  It may mitigate, but does not negate, the other substantial evidence of a knowing and intentional taking of DSS funds, especially where deception was largely irrelevant given Moss's cavalier attitude and poor oversight and St. Clair's participation in the same illegal behavior.  The evidence was sufficient to support the jury's decision.

- 16 -

The jury had the opportunity to evaluate the "climate" on the reservation and was instructed that good faith is a complete defense "because good faith on the part of the defendant is, simply, inconsistent with . . . a finding of knowingly, willfully, intentionally or deliberately embezzling, stealing, misapplying, or converting without authority money or property." (R. Vol. 1 at 234.) As the government argues and the evidence supports, "[b]ased upon the jury's subsequent verdict, [it] simply and reasonably did not believe [Addison's allegedly good faith] explanations." (Appellee's Br. at 28.)

**AFFIRMED.**