**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**March 7, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

───────────────────────────────

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

QUENTIN VENENO, JR.,

    Defendant - Appellant.

No. 21-2101
(D.C. No. 1:18-CR-03984-KWR-1)
(D. N.M.)

───────────────────────────────

**ORDER**

───────────────────────────────

Before **CARSON**, **EBEL**, and **ROSSMAN**, Circuit Judges.

───────────────────────────────

This matter is before the court on the *Petition for Rehearing or Rehearing En Banc* (Petition) filed by Appellant. We also have a response from Appellee. Upon careful consideration, we direct as follows.

Pursuant to Fed. R. App. P. 40, Appellant's request for panel rehearing is GRANTED IN PART to the extent of the modifications in the attached revised opinion. The court's September 12, 2023 opinion is withdrawn and replaced by the attached revised opinion, which shall be filed as of today's date. Because the panel's decision to partially grant panel rehearing resulted in only non-substantive changes to the opinion that do not affect the outcome of this appeal, Appellant may not file a second or successive rehearing petition. *See* 10th Cir. R. 40.3.

The Petition, response, and revisions to the court's original opinion were transmitted to all non-recused judges of the court who are in regular active service. As no member of the panel and no judge in regular active service requested that the court be polled, Appellant's request for rehearing en banc is DENIED. *See* Fed. R. App. P. 35(f).

Entered for the Court,

CHRISTOPHER M. WOLPERT, Clerk

FILED
**United States Court of Appeals
Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**March 7, 2024**

**Christopher M. Wolpert
Clerk of Court**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

QUENTIN VENENO, JR.,

    Defendant - Appellant.

No. 21-2101

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:18-CR-03984-KWR-1)**

---

Alan S. Mouritsen, Parsons Behle & Latimer, Salt Lake City, Utah, for Defendant-Appellant Quentin Veneno, Jr.

Emil J. Kiehne, Assistant United States Attorney, Albuquerque, New Mexico (Alexander M.M. Uballez, United States Attorney, with him on the brief) for Plaintiff-Appellee United States of America

---

Before **CARSON**, **EBEL**, and **ROSSMAN**, Circuit Judges.

---

**CARSON**, Circuit Judge.

---

The COVID-19 pandemic caused an unprecedented disruption to jury trials. The district courts faced the arduous task of conducting jury trials amid a pandemic while keeping jurors, court staff, and the public safe from transmission of the virus.

Protecting the public's safety conflicts with a defendant's constitutional right to have an open trial. But that right is not absolute.

In this case, the district court conducted two hours of voir dire in a courtroom closed to the public and broadcasted live over an audio feed. After Defendant Quentin Veneno, Jr. objected, the district court concluded that the dangers of the COVID-19 pandemic justified its closure of the courtroom, but also provided a video feed for the rest of trial. Although Defendant objected to the initial audio-only feed after the initial two hours of voir dire, he never requested that the district court restart jury selection or moved for a mistrial.

Defendant also challenges Congress's constitutional authority to criminalize the conduct of Indians on tribal land, whether a previous conviction can be a predicate offense for 18 U.S.C. § 117(a)(1) convictions, and whether admission of other-act evidence met the rigors of Federal Rule of Evidence 404(b). Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

Defendant Quentin Veneno, Jr. lived with his then-girlfriend—both enrolled members of the Jicarilla Apache Nation—on the Jicarilla Apache Nation reservation. One morning, his girlfriend woke up and decided to check her phone to see the time. Defendant walked into the room, asked who she was talking to, accused her of talking to other men, and knocked the phone out of her hand. Defendant then hit her several times with his closed fist. Defendant's girlfriend slipped by him, ran down a

2

hallway, jumped out of a kitchen window, and escaped to a neighbor's house. That neighbor called law enforcement.

Defendant reconciled with his girlfriend. Two months later, however, he became jealous and kicked his girlfriend's upper body and arm several times with shoes on his feet. She fled and hid for a few hours in the hills behind her house. When she returned home, Defendant's girlfriend explained her absence, but he did not believe she was hiding. Rather, Defendant accused her of being with another man. She took him to her hiding place. His response: "Should I just kill you now?"

Five days after that incident, Defendant again attacked his former girlfriend in another morning fit of jealous rage. Defendant hit the phone out of her hand, accused her of talking with other men, grabbed her by the hair, threw her on the floor, and kicked her while wearing shoes. Defendant then dragged her outside the bedroom, down a hallway and out the kitchen door. He continued to kick her and grabbed her either by her hair or arms and slammed her head into the cement outside. After the attack, Defendant's girlfriend tried to take ibuprofen. She went to pour some milk. Defendant was behind her, grabbed the milk, dumped the entire gallon on her head, and said "Here's your [f-ing] milk." Despite seeing her in extreme pain, Defendant prevented her from seeking care.

Two days after the last assault, Defendant's girlfriend sought medical attention in Defendant's absence. She stayed in the hospital for five days, suffering from a collapsed lung and nine broken ribs. Medical professionals gave her an epidural to control her pain.

A federal grand jury charged Defendant with two counts of domestic assault by a habitual offender in Indian Country under 18 U.S.C. §§ 117(a)(1), 1153—one count for each of Defendant's jealous rages. A federal grand jury also charged Defendant with assaulting his girlfriend in Indian Country resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(6), 1153.

Prior to trial, the government notified Defendant of its intent to present evidence of prior bad acts. The two counts of domestic assault by a habitual offender contain a prior-conviction element. The government listed three prior assault convictions as predicates: two battery convictions against a household member in the Jicarilla Apache tribal courts and one federal conviction of domestic assault by a habitual offender in Indian Country. The government also requested to introduce evidence that Defendant had assaulted his then-girlfriend shortly before both charged assaults. Defendant opposed admission of the evidence and filed a motion in limine. The district court granted Defendant's motion in limine.

As trial loomed, the government and Defendant weighed the prospect of Defendant stipulating to the prior convictions. The government argued that a potential stipulation would qualify those offenses as predicate offenses under the habitual-offender statute. Defense counsel stated that he was not sure his client would allow him to stipulate. The district court told him that if Defendant did not stipulate, the absence of a stipulation would allow the government to go into prior bad acts. Defense counsel replied, "We would rather not do that, so we'll defer and we'll stipulate to that."

4

The government also sought to introduce evidence under Federal Rule of Evidence 404(b) that Defendant physically assaulted his then-girlfriend a few days before the second charged assault. The district court agreed with the government that the evidence could come in at trial. It reasoned that the evidence was admissible to prove that his victim had suffered "great bodily harm"—a statutory element of Defendant's charged crime—as well as to demonstrate motive and lack of mistake. After balancing, the district court held that the probative value of the evidence outweighed any prejudice associated with these prior events.

Defendant's trial was the first trial the District of New Mexico held during the COVID-19 pandemic. The District of New Mexico issued an administrative order, 20-MC-4-17, which noted the guidance issued by the Centers for Disease Control and Prevention and the New Mexico Department of Health. The order limited entry to the courthouse to those persons having official court business. The District of New Mexico also developed a "Plan for Resumption of Jury Trials in DNM During the Pandemic," which detailed the procedures that the district court judges were to employ. The plan allowed members of the public and media to attend trial through an audio feed from the court's website. It also read, "Video streaming is being explored by the Court's Information Services Innovations team." And at the pretrial conference, the district court informed the parties that it spent months coming up with a detailed protocol about how it would handle the trial to make sure that all the parties, all of the witnesses, all of the jurors, everyone involved, was safe.

5

As to the courtroom, the district court's plan only permitted twenty to twenty-five prospective jurors to be in the courtroom at once. So, to comply, the district court planned for two "waves" of venire members—one in the morning and one in the afternoon. Before jury selection, the courtroom deputy sent the parties an internet link from the district court's website that would allow members of the public to listen to the proceedings via an audio feed. Defendant did not object to the administrative order, the plan, or the link to the proceedings.

The first morning of trial, the district court began selecting a jury with the first wave of prospective jurors. At the end of the morning session, the government questioned the constitutionality of providing only an audio feed. The district court agreed to put the administrative order in the record. It also said, "when we talk about a public trial, we're talking about usually we are able to allow members of the public to come in and observe the trial, and because we've had to reconfigure the entire courtroom based on this pandemic and concerns for the safety of everyone, we cannot."

When asked whether he had comment, Defendant's attorney stated that he assumed that the court was providing both an audio and a video feed of the trial. The district court then told counsel that the court did not have the capability of a video feed. Defendant then objected to an audio-only feed. The court recessed for two hours. During the two-hour recess, the district court set up a video feed and stated that, going forward, the public could listen and watch over a video feed.

6

After returning to the record, Defendant formally objected to the lack of video. In response, the district court first noted that they "had discussed this several times prior to trial" and that the video issue arose after the parties had already completed the first wave of jury selection. The district court then turned to the merits of Defendant's objection and concluded the trial was not totally closed to the public because of the audio feed, which the public could access through the district court's public website. In the alternative, the district court also concluded that even if it totally closed the courtroom, Waller v. Georgia, 467 U.S. 39 (1984), permitted a total closure.

A total closure requires an overriding public interest that is likely to be prejudiced if the court does not close the proceedings. Waller, 467 U.S. at 48. And the "closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." Id. First, the danger posed by the COVID-19 pandemic constituted an overriding interest that justified the closure. The district court found that "[u]nder the specific circumstances, it is not possible to maintain social distancing while granting the public physical access to the courtroom." Second, the closure was not broader than necessary to protect the public health, because "it is not possible to adequately social distance and put the public in the gallery because the venire panelists and jury will occupy the gallery." Third, the district court said that reasonable alternatives "have been put in place, as the proceeding is available to the public through audio and video." Finally, the district

7

court said it believed that it had made adequate factual findings to support the closure. Defendant did not object to the district court's findings.

After finishing its Waller analysis, the district court asked the parties whether it needed to take up anything else before resuming jury selection. Defendant said no. He did not object to moving to the afternoon panel rather than redoing the morning panel with video. And after the parties completed the afternoon session, the district court asked the parties if they had any objection to the way they selected their jury. Defendant said he did not.

After a two-day trial, the jury convicted Defendant on all three counts. The district court sentenced Defendant to concurrent prison sentences of sixty months and 115 months on the domestic assault by a habitual offender counts and 115 months on the assault in Indian Country resulting in serious bodily injury count. Defendant appealed.

## II.

On appeal, Defendant first asserts that the district court violated his right to a public trial by preventing the public from attending his trial and by failing to provide a video feed of the first two hours of jury selection. Second, Defendant contends that the government unconstitutionally procured his convictions because Congress lacks the constitutional authority to criminalize the conduct of Indians on tribal land. Next, Defendant argues his prior tribal-court conviction for a domestic violence offense is categorically overbroad and thus cannot be a predicate offense for his § 117

convictions.  Finally, Defendant posits the district court's admission of other-act evidence did not meet the rigors of Rule 404(b).  We address each issue in turn.

A.

We begin with Defendant's argument that the district court denied him his Sixth Amendment right to a public trial.  On this issue, we review the district court's factual findings for clear error, but as to the ultimate issue of whether the district court violated Defendant's right to a public trial, we review de novo.  United States v. Addison, 708 F.3d 1181, 1186 (10th Cir. 2013) (citing United States v. Al-Smadi, 15 F.3d 153, 154 (10th Cir. 1994)).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI. This right extends to jury selection.  Presley v. Georgia, 558 U.S. 209, 213-15 (2010) (per curiam).  The public trial requirement benefits the accused in that the public may see that the process is fair and that he is not unjustly condemned.  Addison, 708 F.3d at 1187 (quoting Waller, 467 U.S. at 46).  Moreover, the "presence of interested spectators" keeps the jury "keenly alive" to the importance of its function and to a sense of its responsibility.  Id. (quoting Waller, 467 U.S. at 46). We have also noted the strong societal interest in public trials in that openness "may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously, and generally give the public an opportunity to observe the judicial system."  Addison, 708 F.3d at 1187 (quoting Gannett Co. v. DePasquale, 443 U.S. 368, 383 (1979)).  It also

9

"discourage[s] perjury," "misconduct of participants," and "decisions based on secret bias or partiality." Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 569 (1980).

But a defendant's right to a public trial is not absolute. Addison, 708 F.3d at 1187 (citing Waller, 467 U.S. at 45). We have held that closures can be total or partial. Id. A district court totally closes a courtroom when it excludes all persons besides "witnesses, court personnel, the parties, and the lawyers." Waller, 467 U.S. at 42. As mentioned above, total closure requires an overriding public interest that is likely to be prejudiced if the court does not close the proceedings. Id. at 48. And the "closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." Id. When the closure is partial rather than total, the defendant's right to a public trial "gives way" if a "substantial" reason for the partial closure exists. Addison, 708 F.3d at 1187 (citing United States v. Galloway, 937 F.2d 542, 545 (10th Cir.1991). In either instance, we do not require a defendant to prove specific harm to obtain relief for a violation of the public-trial guarantee. Waller, 467 U.S. at 49.

Defendant makes three separate arguments arising from this right. First, Defendant contends that the district court erred by closing the courtroom before performing a Waller analysis. Second, Defendant argues that even if the district court's Waller analysis was not belated, the district court's analysis did not meet Waller's standards. Third, Defendant asserts that the district court failed, without

10

justification, to provide a video stream of the first two hours of his trial. The parties disagree about the standard of review for Defendant's third argument—the government argues for plain error and Defendant argues for de novo review.

### 1.

Defendant first argues that we must reverse the district court simply because it did not make its Waller findings before the morning jury selection. He relies on this sentence from Presley: "Waller provided standards for courts to apply before excluding the public from any stage of a criminal trial[.]" Presley, 558 U.S. at 213. But Waller mandates that the district court must do so when the courtroom is closed "over the objections of the accused." Waller, 467 U.S. at 47. Defendant's citation to Presley is inapt. There, defense counsel objected *before* the district court excluded an individual from voir dire proceedings. Presley, 558 U.S. at 210. Here, Defendant objected *after* voir dire proceedings began. The district court never excluded the public from the courtroom "over the objections of the accused" until that point. Waller, 467 U.S. at 47. And the district court addressed the Waller factors as soon as Defendant objected. Thus, the timing of the Waller analysis here does not require reversal.

### 2.

Having determined that the district court timely performed its Waller analysis, we consider Defendant's contention that the district court violated his public trial right by failing to consider less restrictive alternatives as Waller requires. Under

11

Waller's total-closure standard, the district court was justified in ordering a total closure here.[1]

The district court determined that limiting the spread of COVID-19 amid a global pandemic qualified as an overriding interest justifying closure. Defendant, on appeal, accepts this for the sake of argument.[2] Next, the district court believed that its decision was no broader than necessary to protect that interest. The Centers for Disease Control and Prevention and the New Mexico Department of Health recommended social distancing at the time of the trial. The district court determined it had no place for the public to physically be in the courtroom because the jurors would be seated in the gallery during trial and that it could not maintain social distancing while granting the public physical access to the courtroom. As an alternative, the district court provided an audio and video feed on the court's website. And finally, the district court made a record of its findings once Defendant objected, explaining that preventing the spread of COVID-19 compelled the closure, that exclusion of the public was the only way to achieve its goal given social distancing principles and limited space in the courtroom, and that no other reasonable method of proceeding existed.

---

[1] We need not determine today whether providing an audio/visual feed while excluding live spectators is a total or partial closure. For purposes of our analysis we assume the district court ordered a total closure of the courtroom.

[2] The Supreme Court agrees too. See Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 67 (2020) (per curiam) ("Stemming the spread of COVID-19 is unquestionably a compelling interest").

After making its findings, the district court asked if either party had anything to say. Defendant said no. He did not object to the district court's findings or suggest that they could not support the closure. Now, on appeal, Defendant seeks reversal based upon Waller's requirement that the closure be no broader than necessary to protect that interest. Now, with the trial concluded, Defendant argues that the district court could have reserved seats for the public, the press, or Defendant's family in the gallery. Anticipating the government's position that Defendant forfeited this argument, Defendant posits that he preserved the argument and because the error would be structural, the law entitles him to automatic reversal of his conviction. On the other hand, the government argues that the district court considered these scenarios and that Defendant's real issue is with the district court's factual findings, which we should review for clear error.

A structural error is one that "'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.'" Weaver v. Massachusetts, 137 S. Ct. 1899, 1907 (2017) (quoting Arizona v. Fulminante, 499 U.S. 279, 310 (1991)). It's an error that "infect[s] the entire trial process." Neder v. United States, 527 U.S. 1, 9 (1999). No doubt exists that "a violation of the right to a public trial is a structural error." Weaver, 137 S. Ct. at 1908. But that still does not excuse Defendant from objecting in the district court.[3] Id. at 983–84 (noting that

---

[3] Other circuits have applied plain error to unpreserved Sixth Amendment public trial claims. United States v. Anderson, 881 F.3d 568, 572 (7th Cir. 2018), United States v. Negron–Sostre, 790 F.3d 295, 301 (1st Cir. 2015); United States v.

13

even if an error is structural, under plain-error review, the defendant must show the error was plain).

Defendant never objected to the district court's conclusion that the closure was no broader than necessary.[4]  If Defendant wanted the district court to reserve seats for the public, the press, or Defendant's family in the gallery, he needed to say so when the district court asked whether he had anything to say on the matter—a time when the district court could have accommodated any of Defendant's requests.  A litigant may not hold an objection in his back pocket at trial simply to raise it for the first time on appeal hoping it might ultimately work in his favor.  United States v. Turrietta, 696 F.3d 972, 985 (10th Cir. 2012).

We thus review Defendant's claim for plain error.  To establish plain error, Defendant has the burden of showing "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Gonzalez-Huerta, 403 F.3d 727, 732 (10th Cir. 2005) (en banc).  But Defendant failed to address plain error in his briefing—even after the government addressed it in its response brief.  The failure to

---

Cazares, 788 F.3d 956, 966 (9th Cir. 2015); United States v. Gomez, 705 F.3d 68, 74–75 (2d Cir. 2013).

[4] In fact, defense counsel at one point tacitly suggested he agreed with the manner in which the district court conducted the proceedings.  This occurred when, after the parties completed the afternoon session, the district court asked the parties if they had any objection to the way they selected their jury and Defendant said he did not.

argue for plain error and its application on appeal "surely marks the end of the road for an argument for reversal not first presented to the district court." Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1131 (10th Cir. 2011) (citing McKissick v. Yuen, 618 F.3d 1177, 1189 (10th Cir.2010).

But even if Defendant did argue for plain error, the result would be the same. The District of New Mexico's Plan for Resumption of Jury Trials explained that during jury selection, the potential jurors would occupy the jury box and the gallery. During trial, the jurors and alternate jurors would occupy the gallery. The jury box would serve as the witness box. For these reasons, the district court judge, who was present in her courtroom and understood the courtroom's limitations, concluded that the courtroom could not safely hold any more spectators.

Trial courts must take every *reasonable* measure to accommodate public attendance at criminal trials. Presley, 558 U.S. at 215. For plain error to be present, the error must have been clear or obvious at the time of the appeal. United States v. Gonzalez-Huerta, 403 F.3d 727, 732 (10th Cir. 2005). Holding a trial in September 2020 provided an unprecedented challenge to the district court. After objection to the closed courtroom, the district court properly analyzed the closure, correctly found an overriding interest justifying closure, appropriately determined the closure was no broader than necessary, and reasonably concluded no reasonable alternatives existed. We believe the district court made an eminently reasonable determination to seat the jurors in the gallery. And even if we assumed this were error, such error would not be clear or obvious. Although the district court could possibly have made room for a

15

few members of the public, doing so was not necessarily reasonable at the height of

the pandemic. Indeed, reorganizing the entire juror seating arrangement for a few

people would be unreasonable given the context. The district court met Waller's

standards.

3.

Defendant also urges us to reverse—even if the district court's Waller analysis

satisfied the Constitution—because the district court did not provide an adequate

explanation for its failure to provide a video feed of the first two hours of his trial.

As mentioned above, after realizing that the district court broadcasted the morning

voir dire session via audio only, Defendant objected that the district court

compromised his Sixth Amendment right to a public trial. The district court then,

over the objection of Defendant, addressed the Waller factors and provided a video

feed.

As mentioned in earlier, his failure to object to the closed courtroom at the

start of the trial prevented de novo review of this issue.[5] Ordinarily, we would

review Defendant's forfeited claim for plain error. But Defendant fails to argue for

---

[5] The dissent claims that we require "clairvoyance" in our preservation
determination. But in this case, the district court not only invited the parties to view
the courtroom on multiple occasions and to ask any questions, but also provided the
parties with an internet link from the district court's website that would allow
members of the public to listen to the proceedings via an *audio* feed. Likewise, the
District Court's plan for jury trials during the pandemic made clear it was only
exploring a video feed. Although the deputy clerk's email did not make it on the
docket before trial, an email provides "notice" to counsel—no clairvoyance needed.

plain error in his opening brief.  In his reply brief, Defendant footnotes the plain error issue raised by the government but again does not address it.  So Defendant loses on his lack of response alone.[6]  Richison, 634 F.3d at 1131.

B.

We next turn to Defendant's contention that the government unconstitutionally procured his convictions because Congress lacks the constitutional authority to criminalize the conduct of Indians on tribal land.  Defendant acknowledges that this argument contradicts Supreme Court authority and that he advances it solely to preserve the issue.  See United States v. Kagama, 118 U.S. 375, 379–80 (1886) (providing that Congress has plenary power over Indian tribes that allows Congress to give federal courts jurisdiction over the conduct of Indians on tribal land).  Because

---

[6] Although Defendant did not argue for plain error on appeal, the government presents what might have been his arguments.  And although Defendant did not develop that the district court erred with legal propositions, the government noted that the Ninth Circuit held that an audio only feed cannot protect a defendant's right to a public trial when a video feed is also available.  United States v. Allen, 34 F.4th 789, 799(9th Cir. 2022).  But Defendant could not have argued successfully that the error "is clear or obvious if 'it is contrary to well-settled law.'" United States v. Finnesy, 953 F.3d 675, 684 (10th Cir. 2020).  "In general, for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue."  Id. (quoting United States v. Ruiz-Gea, 340 F.3d 1181, 1187 (10th Cir. 2003).  Here, neither we nor the Supreme Court has addressed the error.  Lastly, the government contends that Defendant has failed to show that "it seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings."  Id. (quoting United States v. Rivas-Macias, 537 F.3d 1271, 1281 (10th Cir. 2008).  He could have easily asked to strike the morning voir dire panel and begin anew.  This would have been a simple and painless remedy.  We agree.  Even if Defendant had argued for plain error, he would fail under that analysis.  We express no opinion on the merits of the issue given Defendant's forfeiture.

17

we must follow Supreme Court precedent, we reject Defendant's argument. <u>Jewell v. United States</u>, 749 F.3d 1295, 1300 (10th Cir. 2014).

C.

Defendant next posits that his prior tribal-law conviction for a domestic violence offense is categorically overbroad and thus cannot be a predicate offense for his § 117 convictions. Section 117(a)(1) provides that a person who commits a "domestic assault within . . . Indian country" is subject to enhanced penalties if he has two prior convictions "in Federal, State, or Indian tribal court proceedings for offenses that would be, if subject to Federal jurisdiction . . . any assault, sexual abuse, or serious violent felony against a spouse or intimate partner." Whether a prior conviction counts as a predicate offense for purposes of a statute that imposes enhanced penalties on recidivists is ordinarily a matter of statutory interpretation that we review de novo. <u>United States v. Mendez</u>, 924 F.3d 1122, 1124 (10th Cir. 2019) (citing <u>United States v. Charles</u>, 576 F.3d 1060, 1066 (10th Cir. 2009)). But Defendant did not make this argument at trial. When a defendant does not object to the district court, we review for plain error. <u>United States v. Wilkins</u>, 30 F.4th 1198, 1203 (10th Cir. 2022) (citing <u>Gonzalez-Huerta</u>, 403 F.3d at 1245).

Defendant does not address plain-error review, which effectively forecloses his appeal on this issue. <u>Richison</u>, 634 F.3d at 1131. Rather, he analyzes the New Mexico assault statute. The government correctly responds that the conviction was under Jicarilla tribal law. Defendant—in his reply brief—contends that the Jicarilla law is also categorically overbroad. But, again, he does not argue for plain error. For an error to be

18

plain, it must be "clear or obvious under current law." United States v. Rosales-Miranda, 755 F.3d 1253, 1258 (10th Cir. 2014). Defendant has not argued categorical overbreadth for the Jicarilla tribal laws. Defendant has cited no tribal-court decisions or authoritative sources of tribal law that might bear on the meaning of § 3-5-3(A), nor has he cited any decisions in this Court or any other analyzing that tribal statute. Defendant has thus forfeited this argument.

### D.

Finally, Defendant asserts the district court's admission of other-act evidence did not meet the rigors of Federal Rule of Evidence 404(b). Rule 404(b)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). "Rule 404(b) is considered to be 'an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition.'" United States v. Tan, 254 F.3d 1204, 1208 (10th Cir. 2001) (quoting United States v. Van Metre, 150 F.3d 339, 349 (4th Cir. 1998)). Evidence that a district court properly admits under Rule 404(b) may involve a kind of propensity inference. United States v. Moran, 503 F.3d 1135, 1145 (10th Cir. 2007). We review the court's Rule 404(b) analysis for an abuse of discretion. United States v. Hardwell, 80 F.3d 1471, 1488 (10th Cir. 1996).

19

Rule 404(b) evidence must meet four admissibility requirements. "The evidence of other crimes, wrongs, or acts (1) must be introduced for a proper purpose, (2) must be relevant, (3) must have probative value that is not substantially outweighed by the potential for unfair prejudice, and (4) on request, the trial court must give a jury instruction limiting the evidence to the proper purpose." Id. (citing Huddleston v. United States, 485 U.S. 681, 691–92 (1988)) (cleaned up). When a court admits other-act evidence for a proper purpose and that evidence is relevant, "it may be admissible even though it has the 'potential impermissible side effect of allowing the jury to infer criminal propensity.'" Moran, 503 F.3d at 1145 (quoting United States v. Cherry, 433 F.3d 698, 701 n.3 (10th Cir. 2005)).

The government easily meets the first factor—proper purpose. The evidence supported the government's assertion that jealousy motivated Defendant's attacks arising from his suspicion that his girlfriend was cheating on him. The government also offered the evidence to identify Defendant as the perpetrator. Defendant argued that his girlfriend had been drunk during the assaults and her identification was unreliable. The evidence showed he had beaten her several days before in the same place, in the same way, and for the same reason, which makes it more likely that her identification of Defendant was reliable. The evidence also shows that not all his girlfriend's injuries were attributable to the charged assault.

The government also easily meets the second factor—relevance. The uncharged and charged acts are similar. They are relevant to prove Defendant was his girlfriend's attacker and to prove his motive for doing so. Within a span of days,

20

Defendant assaulted his girlfriend in the same place and in the same manner.  The similarity is obvious.

Defendant mainly argues the government violated the third admissibility requirement, which requires us to balance the probative value of the evidence against its prejudicial effect under Federal Rule of Evidence 403.  Id.  We have recognized the probative value of uncharged acts to show motive, intent, and knowledge—whether the acts involved previous conduct or conduct after the charged offense—"as long as the uncharged acts are similar to the charged crime and sufficiently close in time."  United States v. Zamora, 222 F.3d 756, 762 (10th Cir. 2000) (citing United States v. Olivo, 80 F.3d 1466, 1468–69 (10th Cir. 1996) and United States v. Bonnett, 877 F.2d 1450, 1461 (10th Cir. 1989)).  We do not require the uncharged crime to be identical.  Id. (citing United States v. Guiterrez, 696 F2d 753, 755 (10th Cir. 1982)).  The government may show the similarity through "physical similarity of the acts or through the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic offense and charged offenses."  Id. (citing United States v. Queen, 132 F.3d 991, 996 (4th Cir. 1997) (internal quotation marks omitted)).  "The more similar the act or state of mind is to the charged crime, the more relevant it becomes."  Id.  Along with temporal proximity, we have also identified these factors in assessing similarity: identified geographical proximity, the sharing of similar physical elements, and whether the acts are part of a common scheme.  United States v. Mares, 441 F.3d 1152, 1158 (10th Cir. 2006).

21

"Our cases make clear that the degree to which factors such as temporal distance and geographical proximity are important to a determination of the probative value of similar acts will necessarily depend on the unique facts of each case's proffered evidence." Id.  The evidence is probative.  The uncharged conduct and the charged conduct both involve Defendant kicking his girlfriend in her house.  And the assaults were mere days apart.  The prior act is nearly identical to the later act.  As to prejudice, we conclude it is minimal.  The jury heard about Defendant's prior domestic violence convictions because of § 117's elements.  And those prior convictions were more prejudicial to Defendant and alleviate any unfair prejudice that this act creates.  Cf. United States v. Otuonye, 995 F.3d 1191, 1207 (10th Cir. 2021) (stating that where the evidence was more than sufficient to convict the defendant and where wrongly admitted evidence was cumulative of other properly admitted evidence, that evidence was less likely to have injuriously influenced the jury's verdict).  Excluding relevant evidence under Rule 403 "is an extraordinary remedy" and we should use it "sparingly." Id. at 1206 (quoting K-B Trucking Co. v. Riss Int'l Corp., 763 F.2d 1148, 1155 (10th Cir. 1985)).  We decline to do so today. The district court did not abuse its discretion by admitting the evidence.

Fourth, and finally, the last factor allows the defendant to receive a limiting instruction upon request.  The district court offered such an instruction here.  As a result, the district court properly found the evidence satisfied the four elements and thus properly admitted the evidence under Rule 404(b).

AFFIRMED.