The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
January 25, 2024

## 2024COA9

**No. 21CA0309, *People v. Roper* — Constitutional Law — Sixth
Amendment — Right to Public Trial — Partial Courtroom
Closure — *Waller* Test — Findings**

A division of the court of appeals resolves an open issue,

concluding that when a trial court's findings under *Waller v.

Georgia*, 467 U.S. 39 (1984), are not sufficient to support a partial

courtroom closure, but a remand for further findings does not

appear to be futile, a limited remand is an appropriate remedy.

Court of Appeals No. 21CA0309
Boulder County District Court No. 19CR447
Honorable Thomas F. Mulvahill, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Zachary Orion Roper,

Defendant-Appellant.

## ORDER OF LIMITED REMAND

Division VII
Opinion by JUDGE TOW
Brown and Schock, JJ., concur

Announced January 25, 2024

Philip J. Weiser, Attorney General, Jessica E. Ross, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Taylor J. Hoy, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     The COVID-19 pandemic had far-reaching effects on every aspect of life, and the criminal justice system was certainly no exception.  Courts had to grapple with the difficult question of how to conduct a jury trial in a manner that simultaneously protected the defendant's rights to a speedy and fair trial, while safeguarding the health of the participants and the public.  In particular, the virus necessitated certain social distancing requirements, making the task of providing a public trial even more challenging.

¶ 2     One common method adopted by courts was to provide an audio and video livestream of the proceedings to the public.  In many cases, this included permitting the public to view the proceedings while sitting, socially distanced, in a different courtroom in the courthouse.

¶ 3     The trial court invoked this procedure when defendant, Zachary Orion Roper, was tried for and convicted of sexual assault (victim helpless) and sexual assault (victim incapable of appraising the nature of their conduct).  On appeal of his conviction, Roper contends, among other things, that this arrangement was a partial courtroom closure that was not supported by sufficient findings.  *See Waller v. Georgia*, 467 U.S.

1

39, 48 (1984) (holding that a trial court "must make findings adequate to support the closure"). He further contends that the failure to make adequate findings to justify the partial courtroom closure constitutes structural error requiring automatic reversal of his convictions.

¶ 4     Roper's challenge requires us to resolve a question that has often been mentioned but never conclusively resolved by a Colorado appellate court: Does the trial court's failure to make sufficient findings at the time of the court closure amount to structural error or can that insufficiency be remedied by remanding to the trial court for further findings? We conclude that, where the trial court's findings are incomplete, but it appears that a remand would not be futile, an appellate court is not precluded from remanding to the trial court for more findings. We further conclude that such a remand is appropriate here.

## I.     Background

¶ 5     Roper's trial was originally scheduled for April 2020, but he requested a continuance due to the COVID-19 pandemic. The People agreed, and the case was continued. After a second continuance, Roper's trial was rescheduled for October 2020.

Roper asked for a third continuance because of the pandemic, stating that he would waive his speedy trial right. Roper also requested that four family members and four friends be permitted to attend his trial in person. He asserted that not allowing these people to be present in the courtroom during his trial would violate his right to a public trial.

¶ 6    At the pretrial hearing, the trial court denied Roper's request for a third continuance. The trial court and parties then discussed the modified trial procedures in place as a result of the pandemic. The trial court noted that these procedures were "formulated with the input of the district attorney, the office of the public defender, probation, [and] security, and [were] ultimately vetted and approved by Boulder County Public Health."

¶ 7    The trial court also mentioned *Waller* and stated that "[w]e are not going to be able to accommodate family members or friends in the actual courtroom during the trial." Instead, the trial court advised the parties that, due to current COVID-19 health and safety regulations, jury selection would be done in one of two essentially identical courtrooms that could hold twenty-two potential jurors with appropriate social distancing, and the jury assembly room

could hold twenty-eight additional potential jurors who would observe the jury selection via Webex. The court informed the parties that the trial would be in a smaller courtroom, and that the public could observe the trial proceedings via Webex, either online or from the public viewing area located in another courtroom in the courthouse. The court said that during the trial, the twelve jurors would be seated in the gallery bench seats. The court also agreed — at Roper's request — to advise each witness that the trial was being observed via Webex.[1]

¶ 8 Both during the pretrial hearing and at the start of trial, Roper objected to restricting the public's access to the courtroom. In response to the latter objection, the trial court said, "With respect to your position about the public in the courtroom, the court facilities aren't sufficiently large to allow the public to be in the physical courtroom where the trial is taking place. So public access to the courtroom is being provided through Webex." The court also stated

---

[1] The trial court denied Roper's request to notify the jury that his friends and family were watching the trial and to have a screen in the courtroom showing the participants who were watching. The court also denied Roper's suggestion to display pictures of his family and supporters in the courtroom as a way of informing the jurors and witnesses of their presence on the livestream.

that Roper's family could watch the livestream in the adjacent courtroom and could have contact with Roper during breaks.

¶ 9 After the trial, in a written and signed minute order describing the trial proceedings, the trial court noted that the trial "proceedings were held pursuant to the health and safety provisions of the 20th Judicial District Court's Administrative Order 20-110 – Resumption of Jury Trials." The trial court also noted the applicability of "the 20th Judicial District Court's Plan for Resuming Jury Trials Safely During Covid-19 Health Emergency." Neither of those documents is in the record.

## II. Courtroom Closure

¶ 10 Roper contends that the trial court's exclusion of all members of the public from the courtroom, despite their being able to view the trial in a separate courtroom via a live audio and video stream, constituted a complete closure of the courtroom. Further, Roper contends that the closure, whether complete or partial, was not justified under Waller and thus violated his right to a public trial under the Sixth Amendment to the United States Constitution and article II, section 16 of the Colorado Constitution, resulting in structural error requiring automatic reversal. We conclude —

5

consistent with other divisions of this court — that the separate courtroom livestream arrangement constituted a partial closure and further agree that the trial court's findings were insufficient to support that partial closure. But we disagree that the mere inadequacy of the court's findings rises to structural error.

## A.     The Right to a Public Trial

¶ 11     The United States and Colorado Constitutions guarantee criminal defendants the right to a public trial. *See* U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16. "This right 'is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.'" *People v. Jones*, 2020 CO 45, ¶ 16 (quoting *Waller*, 467 U.S. at 46).

¶ 12     Courtroom closures, whether total or partial, can violate a defendant's right to a public trial. *Id.* at ¶ 27. But a defendant's right to a public trial is not absolute, and at times it must yield to competing interests. *People v. Lujan*, 2020 CO 26, ¶ 15 (citing *Waller*, 467 U.S. at 45). As the United States Supreme Court articulated in *Waller*, for a courtroom closure to be justified,

6

> the party seeking to close the hearing must
> advance an overriding interest that is likely to
> be prejudiced, the closure must be no broader
> than necessary to protect that interest, the
> trial court must consider reasonable
> alternatives to closing the proceeding, and it
> must make findings adequate to support the
> closure.

467 U.S. at 48.

¶ 13     In some circumstances, even if the trial court fails to make the necessary *Waller* findings, "some closures are simply so trivial that they do not rise to the level of a constitutional violation." *Lujan*, ¶ 16. In determining whether a closure was trivial, we "consider whether it implicated the protections and values of the public trial right." *Id.* at ¶ 28. These values include ensuring a fair trial, reminding the prosecutor and judge of their responsibility to the accused and the importance of their functions, encouraging witnesses to come forward, and discouraging perjury. *Id.* at ¶ 14. In analyzing whether a closure implicates the public trial right, the court must consider the duration of the closure, the substance of the proceedings that occurred during the closure, whether the proceedings were later memorialized in open court or placed on the record, whether the closure was intentional, and whether the

closure was total or partial. *Id.* at ¶ 19. This inquiry considers the totality of the circumstances, and no single factor is dispositive. *Id.*

### B.  Standard of Review

¶ 14     "Because a trial court's decision to close the courtroom presents a mixed question of law and fact, we review the court's legal conclusions de novo and its findings of fact for clear error." *People v. Turner*, 2022 CO 50, ¶ 19 (citation omitted).

### C.  Closure

¶ 15     The People argue that the livestream arrangement constitutes a fully public trial and, thus, is not a closure at all. Initially, we note that it is not clear that the People should be permitted to advance this argument, given that the prosecutor at trial characterized the arrangement as a partial closure. Regardless, we find no merit in the contention. If the livestreaming of a trial were not at least a partial closure, all future trials could be conducted in this fashion for any reason — or, indeed, for no reason whatsoever. While advancements in technology allow what is essentially a televised trial to serve — under proper circumstances — as an alternative to a complete closure, we do not believe the Sixth

Amendment permits an unfettered shift to televised, but otherwise closed, trial proceedings.

¶ 16     After briefing in this matter closed, a division of this court held that the exclusion "of the entire public . . . from the physical courtroom constituted a partial closure — despite the availability of a live video and audio stream of the proceedings." *People v. Bialas*, 2023 COA 50, ¶ 15.[2] We acknowledge that in *Bialas*, some members of the public were permitted in the courtroom at the beginning of the trial but were later removed, *id.* at ¶¶ 3-4, where, here, the livestream arrangement was the only way any member of the public was permitted to view the proceedings from the outset. Thus, one might argue — as Roper does — that the closure here was a complete, not a partial, closure. We need not decide — and indeed express no opinion on — that issue, however, because we agree that, consistent with *Bialas*, there was at least a partial closure, and whether that closure was partial or complete does not alter our analysis.

---

[2] Roper referenced this opinion in a notice of supplemental authority filed pursuant to C.A.R. 28(i).

¶ 17 Further, to the extent the People refer to this closure as trivial, we disagree. The closure was for the entire duration of the trial. It was also intentional and precluded in-person attendance by Roper's family. As our supreme court held in *Jones,* ¶ 41, such an exclusion weighs against deeming a closure trivial because excluding the defendant's family from the courtroom removes a reminder to the judge, the prosecutor, and the jury of their collective responsibility for treating the defendant fairly. Thus, even if we assume the closure was partial, and noting that the closure was placed on the record, every other factor points toward a nontrivial closure. *See Bialas,* ¶¶ 18-20. Therefore, we conclude that a closure occurred sufficient to implicate Roper's right to a public trial.

## D. *Waller* Findings

¶ 18 We turn next to whether the trial court properly applied and made adequate findings on the *Waller* factors.

¶ 19 Regarding the first factor, although Roper contends that he does not know what the overriding interest for the closure was, the trial court found, with record support, that it was the protection of all trial participants and spectators from contracting or spreading

COVID-19. The court and both counsel referred to COVID-19 and the global pandemic while discussing the trial procedures. The court explained that the jury trial procedures had been adopted by the judicial district after input from all stakeholders and had been approved by county health officials. The court found that following these procedures was a reasonable plan that "provide[d] for a reasonable degree of safety for all of the trial participants, including the jurors." Therefore, we conclude that the court made adequate findings on the first *Waller* factor. *See Turner*, ¶ 41 & n.4 (exclusion "to ensure . . . the safety of all trial participants" satisfied first *Waller* factor).

¶ 20    At least under the circumstances presented here, the second and third *Waller* factors — addressing, respectively, whether the closure was broader than necessary and whether the court considered reasonable alternatives to closure — overlap. For example, could the jury have been arranged in such a way as to permit a small number of spectators to sit in the back row of the courtroom, like in *Bialas*?[3] Or, if not, could the trial have been

_____

[3] We acknowledge that Bialas's trial took place in a different judicial district.

moved to a courtroom large enough to accommodate some members of the public once the jury was selected — perhaps one of the two courtrooms that were large enough to accommodate the jury selection process? If the answer to either question is yes, then it could be said either that the closure was too broad or that there were reasonable alternatives that were not considered. Similarly, if a continuance of the trial, which Roper requested, would have removed the impediments to conducting a trial with the public's attendance, that might also have been a reasonable alternative.

¶ 21 True, the trial court considered at least some of these issues. The trial court began by considering and rejecting Roper's request for another continuance. The court noted that the offense was a sex offense (and thus the victim had the right to object to further delay) and that the case was "getting on to be two years old." Thus, the court found that another continuance was not appropriate. Under the circumstances, based on the court's specific findings, we agree with the trial court in this regard.

¶ 22 The court then acknowledged Roper's request to have four family members and four friends attend the trial, but said, "We are not going to be able to accommodate family members or friends in

the actual courtroom during the trial." The court also stated that "the court facilities aren't sufficiently large to allow the public to be in the physical courtroom where the trial is taking place." To the extent these statements could be construed as findings, they are conclusory and the record lacks sufficient detail for us to review them. For example, we do not know if using a different seating arrangement within the courtroom or using a different courtroom with a higher seating capacity could have safely accommodated some spectators.

¶ 23 Indeed, though there was a mention that one of the two larger courtrooms the court had referenced when discussing where jury selection would be conducted might be unavailable because of a homicide trial going on at the same time, there is no explanation for why Roper's trial could not have been conducted in the other such courtroom. As noted, those larger courtrooms could accommodate twenty-two prospective jurors, with some seated in the jury box and others seated in the gallery; thus, once a twelve-person jury was seated, and even assuming two alternates, there would still have been room for eight spectators. While the record shows that the trial court gave a reason for using the smaller courtroom —

13

permitting the jurors to be "in much closer proximity to the witness stand" — the court did not explain, for instance, whether a different seating arrangement in the larger courtroom could have allowed the jurors to sit similarly close to the witness stand while also allowing some spectators to be seated toward the back of the room.

¶ 24     In short, the court's statements do not provide us with an adequate picture of whether the closure could have been narrower or whether other reasonable alternatives existed.  And the record is devoid of other evidence describing the physical layout of the trial courtroom or availability of other courtrooms.

¶ 25     The People's arguments to the contrary are unpersuasive.  The People assert that the second *Waller* factor was satisfied: due to the public health interest, courtroom size, and need to reduce the risk of transmission, limiting access to the courtroom was required, even for Roper's family.  But the portions of the record to which the People cite do not provide support for this claim.  Nor do the People cite record support for their conclusory assertion that "allowing Roper's family members to be in the courtroom was not a reasonable alternative."

¶ 26 As to the fourth *Waller* factor — whether the court made adequate findings — our review of the record suggests that, although the trial court mentioned *Waller*, it ultimately deferred to the jury trial procedures adopted for the judicial district, without articulating how the *Waller* factors applied to the specific trial it was about to conduct. As a result, the court did not make adequate findings that the closure was no broader than necessary and that there were no reasonable alternatives to the steps taken. *See Waller*, 467 U.S. at 48.

## E. Remedy

¶ 27 The question then arises what the proper remedy is. Roper contends that the insufficiency of the trial court's findings constitutes structural error and that a remand would be an exercise in futility because the trial court did not make contemporaneous *Waller* findings. The People contend that we should not reverse Roper's conviction but, rather, remand to the trial court to make additional *Waller* findings. We agree with the People.

¶ 28 We begin, however, by acknowledging that the guidance from our supreme court on this point is not entirely clear. In its first opportunity to directly apply *Waller*, our supreme court

characterized the opinion's holding as creating a four-part test: "In *Waller*, the Court articulated four requirements that a trial court must meet *in order to validly close the courtroom.*" *People v. Hassen*, 2015 CO 49, ¶ 9 (emphasis added). The fourth requirement was that the trial court "must make findings adequate to support the closure." *Id.* (quoting *Waller*, 467 U.S. at 48).

¶ 29    In the Colorado Supreme Court's next opportunity to address a *Waller* issue, the court said, in relatively sweeping fashion, "Under *Waller*, the public trial right is violated when a defendant objects to a closure and the court *does not satisfy the four factors* of the *Waller* test." *Stackhouse v. People*, 2015 CO 48, ¶ 7 (emphasis added). The supreme court went on to unequivocally say that "[s]uch a violation is structural error that requires automatic reversal without individualized prejudice analysis." *Id.*

¶ 30    These early authorities appear to establish a hard and fast rule: because the requirement of sufficient supporting findings is a prong of the *Waller* test, inadequate findings mean the test is failed — and a failed test results in automatic reversal.

¶ 31    But more recent case law suggests that the supreme court did not intend such a strict reading of its earlier pronouncements.

16

¶ 32    In *Jones*, ¶ 36, the supreme court concluded that the trial court's exclusion of the defendant's parents from the courtroom "without first making any *Waller* findings" was an unjustified partial closure. But rather than immediately concluding that reversal was required, the supreme court acknowledged that "some courts have chosen to remand cases where the trial court violated the defendant's right to a public trial to allow the trial court to make the required findings." *Id.* at ¶ 45. The court declined to do so in that case, however, because remand would have been futile — both because the judge who had presided over the trial could not make further findings because he had died and because the information from a related dependency and neglect case the People argued would support the closure would not satisfy the second and third *Waller* factors. *Id.* at ¶ 46.

¶ 33    Most recently, in *Turner*, ¶ 1, the trial court excluded the defendant's friend (who was also his codefendant's wife) from the courtroom for the remainder of the trial after the friend had a confrontation with the victim advocate and a prosecution witness just outside the courtroom. In doing so, the trial court did not apply the *Waller* test at all. The supreme court reiterated the *Waller*

17

test as it had been stated in *Jones* and *Hassen*. *Id.* at ¶ 19. The court further concluded that excluding the individual was a nontrivial partial courtroom closure. *Id.* at ¶ 32. And it acknowledged that an unjustified closure is structural error. *Id.* at ¶ 34.

¶ 34     But the supreme court went on to say that "structural error doesn't flow simply from the trial court's failure to employ the precise language found in *Waller*." *Id.* at ¶ 35. It explained that nothing in *Waller* requires a reviewing court "to evaluate the trial judge's closure order *solely* on the basis of the explicit factual findings." *Id.* at ¶ 36 (quoting *Bell v. Jarvis*, 236 F.3d 149, 172 (4th Cir. 2000)). And it cited cases concluding that the *Waller* test was satisfied where the record supported the closure despite the lack of comprehensive findings on each factor. *Id.* (first citing *Tinsley v. United States*, 868 A.2d 867, 877-80 (D.C. 2005); and then citing *State v. Ndina*, 2009 WI 21, ¶ 86). Ultimately, the court concluded that the findings the trial court had made — albeit not specifically in reference to *Waller* — combined with what could be gleaned from the record as a whole justified the closure. *Id.* at ¶ 47. The court expressly referenced the possibility of remanding for further

18

findings, but because the existing findings and record justified the closure, it determined that a remand was unnecessary. *Id.* at ¶ 40.

¶ 35    In the wake of *Jones* and *Turner*, then, it is less clear that the mere fact that the findings were inadequate necessitates reversal.[4] And a deeper analysis of the development of the *Waller* test, along with reference to how other jurisdictions have resolved the question, strongly suggests that a remand for further findings is not categorically prohibited.

¶ 36    First, we note that we are aware of no other multi-prong test that includes *as a prong of the test* the requirement that there be adequate findings. Rather, adequate findings are usually required for an appellate court to properly review a claim of error. *See Turner*, ¶ 36 ("Ultimately, a trial court need only make 'findings specific enough that a reviewing court can determine whether the

---

[4] Interestingly, in one case, the Colorado Supreme Court granted certiorari on the question of "[w]hether a remand is an appropriate remedy when the trial court fails to make findings consistent with *Waller v. Georgia*, 467 U.S. 39 (1984)." *People v. Lujan*, No. 18SC582, 2019 WL 189366 (Colo. Jan. 19, 2019) (unpublished order). But the court never actually resolved the question, concluding instead that the closure in that case was trivial and thus the *Waller* test did not need to be satisfied. *People v. Lujan*, 2020 CO 26, ¶ 37 & n.4.

19

closure order was properly entered.'" (quoting *Davis v. Reynolds*, 890 F.2d 1105, 1109 (10th Cir. 1989), in turn quoting *Waller*, 467 U.S. at 45)).

¶ 37 For example, in challenges involving suspected racial motivation in the exercise of peremptory challenges, a trial court is required to conduct a three-part inquiry that culminates in the trial court making a finding of fact regarding the prosecutor's motivation in exercising the strike. *Batson v. Kentucky*, 476 U.S. 79, 98 & n.21 (1986). Yet, with fair regularity, appellate courts remedy a trial court's insufficient findings during a *Batson* analysis by remanding for further findings. *See, e.g., People v. Rodriguez*, 2015 CO 55, ¶ 21. The mere inadequacy of the finding does not, by itself, establish the constitutional violation.

¶ 38 Second, although the United States Supreme Court in *Waller* included the adequate findings requirement in a single sentence that also included the other three components of what has become known as the *Waller* test, *see Turner*, ¶ 9, it is noteworthy that *Waller* did not explicitly refer to a "four-prong" test. Indeed, the language in *Waller* was presented as a reiteration of the test from *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984). *See*

*Waller*, 467 U.S. at 45, 48.  In *Press-Enterprise*, the Supreme Court

had held,

> The presumption of openness [of criminal proceedings] may be overcome only by an overriding interest based on findings that a closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press-Enterprise*, 464 U.S. at 510.  It does not appear, then, that

the *Waller* Court intended for the adequacy of the findings to be a

prong of the test itself.[5]  Indeed, our supreme court's reiteration of

this language in *Turner*, ¶ 36, suggests a recognition of this.

---

[5] True, in *Waller*, the Supreme Court rejected what it called the Georgia Supreme Court's "post hoc assertion" that the trial court had conducted the proper balancing.  467 U.S. at 48-49, 49 n.8. Some have suggested that this is an admonition against remedying inadequate findings.  *See People v. Turner*, 2022 CO 50, ¶ 69 (Gabriel, J., dissenting).  But in context, the Supreme Court at least arguably only rejected *that* post hoc rationalization because it found no support in the record and was insufficient in any case.  *Waller*, 467 U.S. at 48-49, 49 n.8.  We do not read this language as proscribing any effort to remedy inadequate findings, particularly where that remedy would come not from an appellate court reviewing a cold record but, rather, from the judicial officer who has direct knowledge of all of the circumstances leading to the closure.

¶ 39    And we note that several jurisdictions have concluded that a

remand for further findings may be an appropriate remedy.[6]  For

example, the Tenth Circuit has opined that

> [t]he lack of findings prevents us from
> determining whether the defendant's right to a
> public trial was outweighed by the interest
> asserted by the government in protecting the
> complaining witness.  But to grant appellant a
> new trial under these circumstances without
> making that determination would constitute a
> windfall and would not be in the public
> interest.

*United States v. Galloway*, 937 F.2d 542, 547 (10th Cir. 1991); *see*

*also State v. Rolfe*, 2013 SD 2, ¶ 26 (remanding for the trial court to

"supplement the record with specific findings and reasoning"); *State*

*v. Rollins*, 729 S.E.2d 73, 79 (N.C. Ct. App. 2012) ("Given the

limited closure in the present case and the fact that the trial court

did not utilize the *Waller* four-part test, we hold that the proper

---

[6] We acknowledge that the remedy in *Waller* was itself a remand. But that is a red herring.  In *Waller*, the proceeding that was closed was not the trial but, rather, a hearing on a motion to suppress. Thus, the remedy — which the United States Supreme Court said "should be appropriate to the violation," *Waller*, 467 U.S. at 50 — was a remand not to supplement the findings justifying the closure but, rather, to redo the hearing that was improperly closed.  Thus, the remand in *Waller* provides no support for the People's request for remand here.

22

remedy is to remand this case for a hearing on the propriety of the closure."); *State v. Cote*, 725 A.2d 652, 660 (N.H. 1999) (remanding for findings to determine whether the defendant's right to a public trial was violated); *Kendrick v. State*, 661 N.E.2d 1242, 1244-45 (Ind. Ct. App. 1996) (remanding for findings to determine whether defendant's right to a public trial was violated). *But see State v. Cox*, 304 P.3d 327, 335 (Kan. 2013) (declining to consider remand for further findings).

¶ 40    Most recently, in *State v. Bell*, 993 N.W.2d 418 (Minn. 2023), the Minnesota Supreme Court addressed a very similar fact pattern to the one before us. To permit proper social distancing during the pandemic, the trial court "excluded all spectators from the courtroom but included a one-way video feed that would broadcast [the] trial in an adjacent courtroom." *Id.* at 420. The Minnesota Supreme Court concluded that the trial court's findings were insufficient to show that it considered reasonable alternatives. *Id.* at 427. But instead of reversing the conviction, the Minnesota Supreme Court held that a remand for the trial court to remedy the inadequate findings was the appropriate remedy under *Waller*. *Id.* at 428.

¶ 41    As noted, in *Jones* our supreme court at least suggested that a remand would be appropriate if it would not be futile.  *See Jones*, ¶ 48.  There, the court concluded that a remand would not be helpful because the judicial officer had subsequently died.  *Id.* at ¶ 46.  Moreover, the court concluded that, as to the second and third factors, it was clear from the record that other options had not been "explored contemporaneously."  *Id.* at ¶¶ 48-49.  Finally, the court concluded that "even if findings by another judge based on records from the dependency and neglect case and other reconstruction methods were an option, supplemental findings would still fail to adequately address the second and third factors."  *Id.* at ¶ 50.

¶ 42    In contrast, the trial court judge in this case is still a district court judge, and it would be possible for the same judge to make more detailed findings about his reasoning at the time he closed the courtroom.  *Cf. Jones*, ¶¶ 46, 50.  Further, although the local policy regarding the conduct of trials during the pandemic is absent from our record, the record does reflect that the policy was developed with the input of stakeholders such as the offices of both the district attorney and the public defender.  Thus, it is entirely likely

that a record could be made about what options were considered contemporaneously when developing the policy. *See id.* at ¶¶ 48-50. Moreover, other necessary supplemental findings — such as the size, shape, configuration (e.g., the number of rows and number of seats per row in the gallery), and availability of the courtrooms at the time of Roper's trial — involve objective, easily verifiable information that is largely not subject to shifting recollections or interpretation. These supplemental findings could satisfy the second and third factors.

¶ 43     In sum, the trial court's findings supporting the closure are insufficient. But this defect alone does not amount to structural error. And because a remand for further findings would not be futile, we conclude such a remand is appropriate in this case.[7]

### III.   Order for Remand

¶ 44     The case is remanded to the trial court for the limited purpose of making supplemental *Waller* findings, including, without limitation, what alternatives to excluding all members of the public from the courtroom were considered, the basis for its determination

---

[7] We do not address the merits of Roper's remaining contentions at this time.

that no members of the public could be accommodated in the courtroom, and whether any larger courtroom was available at the time of Roper's trial.

¶ 45 Within seven days of the entry of the trial court's order making further findings, Roper must forward a copy of the court's order to this court, and the case shall be recertified. Upon recertification, a supplemental record consisting of the trial court's order, any pleadings filed on remand, and transcripts of any hearing held on remand shall be ordered.

¶ 46 The court further orders Roper to notify this court in writing of the status of the court proceedings in the event this matter is not concluded within twenty-eight days from the date of this order, and that Roper must do so every twenty-eight days thereafter until the trial court issues its order on remand.

JUDGE BROWN and JUDGE SCHOCK concur.

26