21CA0309 Peo v Roper 11-27-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 21CA0309
Boulder County District Court No. 19CR447
Honorable Thomas F. Mulvahill, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Zachary Orion Roper,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE TOW
Brown and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 27, 2024

---

Philip J. Weiser, Attorney General, Jessica E. Ross, Senior Assistant Attorney General and Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Taylor J. Hoy, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Zachary Orion Roper, appeals the judgment of conviction following a jury verdict finding him guilty of sexual assault (victim helpless) and sexual assault (victim incapable of appraising the nature of her conduct).  We affirm.

## I.    Factual and Procedural Background

### A.    The Offense

¶ 2    The jury heard evidence from which it could reasonably find the following.

¶ 3    M.G. invited Roper to go to a laser tag event her sorority had planned.  Before going to the event, M.G. and Roper attended a small gathering where M.G. drank approximately one cup of alcohol, including vodka and brandy.  By the time they got to the laser tag venue, M.G. was extremely intoxicated.  Witnesses described her as "overly drunk," having trouble walking and standing, stumbling, slurring her speech, out of it, and not understanding what was going on.

¶ 4    Sorority leaders deemed M.G. "too intoxicated" to remain at the event and sent her and Roper home, after telling him that she needed assistance walking.  The sorority leaders ordered M.G. an

1

Uber to take her back to the sorority house, where another sorority sister was waiting for her.

¶ 5      M.G. became even more intoxicated during the Uber ride, laid down in the backseat, and was largely unresponsive according to the driver.  At some point during the ride, Roper changed the drop off location to his apartment without consulting M.G.

¶ 6      When M.G. did not arrive at the sorority house and failed to answer her phone, the sorority sister waiting for her became concerned.  Three sorority sisters and Roper's roommate went to Roper's apartment.  Roper's other roommate let them into the apartment.  Once inside, the group walked in on Roper, naked, with M.G. on his bed.  M.G. was on her stomach, head turned to the side, with her pants pulled down, exposing her vagina.

¶ 7      The group yelled, but despite the yelling, M.G. did not respond.  As one witness described it, "She didn't move at all.  She didn't turn her head or anything."  One of the sorority sisters "was concerned she was unconscious or hurt."  She shook M.G. and rolled her over and after what she described as "a really long time," M.G. was able to respond.  Because M.G. could not walk and was

2

disoriented, her sorority sisters helped her out of Roper's apartment.

¶ 8     M.G. went to the hospital where she underwent a sexual assault examination. During the examination, M.G. told the examiner that Roper had sex with her and provided some other details about the night. At trial, however, M.G. could not remember the assault, and neither the examiner nor M.G. could independently recall the examination. The results from the examination were admitted and showed injuries to M.G.'s genital area.

### B.    The Court Proceedings

¶ 9     Roper did not testify at trial. His theory of defense was that both he and M.G. were intoxicated, M.G. was not as intoxicated as observers claimed, and the sex was consensual.

¶ 10    During the trial, which took place at the height of the COVID-19 pandemic, the public was excluded from the courtroom. A live audio and video stream of the proceedings was provided to spectators sitting, socially distanced, in a different courtroom. On the third day of trial, Roper's counsel informed the court that when witnesses were viewing and testifying about certain surveillance videos, those videos were not also captured by the livestream and

thus were not broadcast to the public viewing the trial remotely. Further, counsel indicated that when a detective would stand during his testimony while explaining certain aspects of the case, the spectators were unable to hear everything he said, as he would apparently stray too far from the microphone.

¶ 11 On appeal, Roper argues that he was denied his right to a public trial. He also challenges the masking protocol, sufficiency of the evidence underlying his convictions, the trial court's handling of two jury questions, and the constitutionality of several statutory provisions. As to the public trial issue, we remanded to the trial court to make further findings under the test articulated in *Waller v. Georgia*, 467 U.S. 39 (1984). *People v. Roper*, 2024 COA 9. Following that remand hearing, the matter is now before us to fully resolve Roper's appeal. In doing so, we address, and reject, each of his claims.

## II.  Courtroom Closure

¶ 12 Roper contends that, even after the limited remand, the trial court's findings fail to justify the courtroom closure. He also contends that the closure violated the public's and press's right to a public trial.

## A. Background

¶ 13 The circumstances of Roper's trial and the trial court's initial lack of adequate *Waller* findings are sufficiently set forth in *Roper*. *Id.* at ¶¶ 1-3, 5-9, 18-26. We need not reiterate them here. Nor need we reiterate the legal analysis underpinning our decision to remand for further findings (notwithstanding the fact that Roper's counsel dedicated much of the effort during the remand hearing to attacking that decision).

¶ 14 At the remand hearing, the court admitted the 20th Judicial District of Colorado Administrative Order 20-110 – Resumption of Jury Trials, which adopted the Plan for Resuming Jury Trials Safely During COVID-19 Health Emergency (the Jury Trial Resumption Plan).[1] The Jury Trial Resumption Plan outlined how the District planned to recommence jury trials in a safe way. It was developed

---

[1] Though Roper objected during the remand hearing to the prosecution supplementing the record, we note that we remanded the matter explicitly for the court to make specific findings regarding what reasonable alternatives were explored. Supplementation of the record was an inherent part of that inquiry. In any event, although Roper maintains his objection to the limited remand, he does not specifically challenge the trial court's acceptance of the supplemental record. Thus, we deem any challenge to supplementing the record (but not the challenge to the limited remand itself) abandoned.

with input from relevant stakeholders — including judges, court staff, prosecutors (including the two prosecutors who appeared at the remand hearing), defense attorneys (including one of the public defenders who appeared at the remand hearing), and public health officials — and took into account information from the Centers for Disease Control and Prevention, the Colorado Department of Public Health and Environment, and other judicial districts regarding their plans for reinstating trials, as well as executive orders issued by Colorado Governor Jared Polis.

¶ 15    The Jury Trial Resumption Plan required all participants to wear masks.  The Plan allowed counsel to provide clear masks to their clients, as well as for witnesses to use during testimony.

¶ 16    The People made a supplemental record about the circumstances that existed at the time of Roper's trial.  The supplementation included the following facts:

- At the time of Roper's trial, the COVID-19 vaccine was not yet available.

- Though the Jury Trial Resumption Plan originally contemplated only one trial proceeding at a time, the decision was made that two trials could be

accommodated as long as each trial's jury pools did not cross paths.

- The first jury trial under the Jury Trial Resumption Plan had already begun on the newer side of the courthouse, where the courtrooms were bigger and had better ventilation.

- Roper's trial, therefore, took place on the older side of the building.

- The public health officials required that all participants (other than the defendant and defense counsel) maintain six-foot social distancing.

- Public health officials would not approve the use of other courtrooms on the older side of the courthouse because of poor ventilation.

- The jury trial resumption committee measured courtrooms and marked places for each juror, abiding by the social distancing guidelines, resulting in there being no room for anybody other than the jurors to be in the courtroom where Roper's trial took place.

- The gallery benches in the courtroom were moved to accommodate the social distancing requirement.

- Because of the social distancing requirement, no one could be seated in the witness stand and the jury box at the same time, so the jury had to be seated in the gallery benches.

¶ 17    The judge presiding over the remand hearing was the same one that presided over Roper's trial. The trial court found that the prosecutors' supplements to the record were accurate and adopted them. The court then made additional findings regarding the closure. It found that the jury trial resumption committee had looked at alternative locations to hold the trial besides the Boulder County Justice Center but concluded that the courthouse was the only option due to availability and security concerns. The court also made findings regarding the layout of the courtroom where Roper's trial took place, including where the gallery benches were placed, the layout of the counsel tables, where the lectern was in relation to the counsel tables, where the jury box was in relation to the counsel tables and its dimensions, where the witness stand was in relation to the jury box, and how the jurors were seated in the

8

gallery. The court also found that the larger courtroom in which jury selection had taken place was five feet deeper and six feet wider than the courtroom where Roper's trial was held.

¶ 18 The trial court then applied the *Waller* test to these findings. The court concluded that Roper had conceded that the ongoing pandemic satisfied the first prong of the test. The court then found that, based on the supplemented record, "the closure was no broader than necessary to protect the public's interest in mitigating the risks of holding jury trials during the then-ongoing COVID-19 pandemic." It further found that it had "considered reasonable alternatives to closing the proceeding."

## B. Applicable Law and Standard of Review

¶ 19 The United States and Colorado Constitutions guarantee criminal defendants the right to a public trial. *See* U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16. "This right 'is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.'" *People v. Jones*, 2020 CO 45, ¶ 16 (quoting *Waller*, 467 U.S. at 46). "A public

9

trial also protects the public's and the press's qualified First Amendment rights to attend a criminal trial." *Id.* at ¶ 18 (citing *Waller*, 467 U.S. at 44, and *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980)).

¶ 20    Courtroom closures, whether total or partial, can violate the right to a public trial. *Id.* at ¶ 27. But the right to a public trial is not absolute, and at times it must yield to competing interests. *People v. Lujan*, 2020 CO 26, ¶ 15 (citing *Waller*, 467 U.S. at 45). As the United States Supreme Court articulated in *Waller*, for a courtroom closure to be justified,

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

467 U.S. at 48.

¶ 21    "Because a trial court's decision to close the courtroom presents a mixed question of law and fact, we review the court's legal conclusions de novo and its findings of fact for clear error." *People v. Turner*, 2022 CO 50, ¶ 19 (citation omitted).

10

## C.   Analysis

### 1.   Futility of Remand

¶ 22   We first reject Roper's argument that the remand was futile.

¶ 23   Roper, citing *People v. Montoya*, 2024 COA 37, ¶ 23, contends that the remand was futile because the prosecutors who appeared at the remand hearing were not the same prosecutors at trial. But *before* Roper filed his supplemental brief, the original *Montoya* decision was modified. *People v. Montoya*, 2024 COA 37M. The modified *Montoya* opinion no longer suggests that a remand is futile merely because trial counsel no longer works for the same office. *Id.* at ¶ 28. Nor does such a suggestion make sense, given that nothing prevented either party from subpoenaing trial counsel to testify at the remand hearing. Moreover, unlike in *Jones*, ¶ 46, where the trial judge had died before any remand hearing could have taken place, the trial judge here remained on the bench and, in fact, conducted the remand hearing.

¶ 24   In sum, there is nothing to suggest that the remand was futile.

¶ 25   Further, we reiterate our rejection of the argument that *Waller* categorically prohibits such remands because they amount to post hoc rationalizations. As we noted in the order of limited remand,

the Supreme Court in *Waller* arguably only rejected the Georgia Supreme Court's post hoc assertion because it had no support in the record and was insufficient in any case. *Roper*, ¶ 38 n.5. Moreover, the specific admonition in *Waller* is against post hoc rationalizations offered by an *appellate* court. And, finally, we again note that we did not remand for the trial court to explain its subjective thought processes but, rather, to make findings about "objective, easily verifiable information that was largely not subject to shifting recollections or interpretation," for example the size, shape, configuration (e.g., the number of rows and number of seats per row in the gallery), and availability of the courtrooms at the time of Roper's trial. *Id.* at ¶ 42.

### 2. Adequacy of the *Waller* Findings

¶ 26 Having concluded that the remand was not futile, we turn to whether the trial court made adequate findings on the *Waller* factors. We conclude that it did.

¶ 27 In *Roper*, we concluded that the first *Waller* factor was met. *Roper*, ¶ 19. Now, both parties agree and the trial court again found, with record support, that the overriding interest was the protection of all trial participants and spectators from contracting

12

or spreading COVID-19.  We turn then to the adequacy of the trial court's findings as to the second and third *Waller* factors: whether the closure was no broader than necessary and whether the court considered reasonable alternatives.

### a.  Roper's Proposed Alternatives During Trial

¶ 28    Roper first contends that the trial court never made sufficient *Waller* findings on three other reasonable alternatives he proposed at trial and again at the remand hearing: (1) a two-way video feed displaying Roper's family and friends to the parties and the jurors; (2) informing jurors that Roper's family and friends were present and observing the trial in another courtroom; and (3) showing or hanging photographs of Roper's family and friends in the empty jury box.

¶ 29    The trial court denied Roper's request to notify the jury that his friends and family were watching the trial and to have a screen in the courtroom showing the participants who were watching.  The court also denied Roper's suggestion to display pictures of his family and supporters in the courtroom as a way of informing the jurors and witnesses of their presence on the livestream.  But the

court agreed — at Roper's request — to advise each witness that the trial was being observed via the livestream.

¶ 30     Roper does not explain how any of his proposed alternatives were reasonable or necessary and we conclude that, as a matter of law, they were not.[2]

¶ 31     As the trial court noted in the pretrial conference, a two-way video feed was unnecessary.  Advising the witnesses (and thereby also advising the jury) that the members of the public were viewing the trial via the livestream, coupled with visible cameras in the courtroom, more than adequately reminded the participants and witnesses that they were being watched.  Roper does not explain how the interests protected by a public trial would be better served by the addition of a screen in the courtroom displaying those members of the public who were viewing the trial.

¶ 32     Roper's request that the court specifically inform the jury that his family and friends were observing the trial exceeds what a defendant is entitled to even in a public courtroom.  The jury is

---

[2] We do not endeavor to provide a post hoc rationalization of the trial court's decision.  *See Waller v. Georgia*, 467 U.S. 39, 48-49, 49 n.8 (1984).  Rather, we hold that Roper has failed to demonstrate that his proffered alternatives were reasonable ones.

rarely, if ever, informed of the *identity* of people who are seated in the gallery observing the proceedings. And Roper provides no authority suggesting that such information is required to be given to the jury. Here, the court's announcements that the public was observing the trial via the livestream were sufficient to alert the jurors that people were watching the trial.

¶ 33 Finally, Roper provides no support for his suggestion that he be entitled to hang photographs of his family members on the walls. Indeed, he does not articulate — nor can we see — how this would have alleviated the effects of a courtroom closure any more than informing the witnesses and jurors that the proceedings were being livestreamed.

### b. Supplemental *Waller* Findings

¶ 34 Regarding the court's supplemental Waller findings in particular, Roper contends that they are inadequate as to the second and third factors because (1) the layout of the courtroom that Roper's trial took place in allowed at least one member of the public to be in the room during opening statements and closing arguments, (2) the larger jury selection courtroom was available for Roper's trial and at least one member of the public could have been

15

in that courtroom during trial, and (3) the court could have delayed the trial.

### i. Opening Statements and Closing Arguments

¶ 35 At the remand hearing, the People stated,

> Your Honor, there was no room for anyone else in the courtroom outside of the jurors in the gallery. The one exception to that would be the jury box at the time of certain summation, but usually, again, if someone was at the witness stand, no one could sit in the jury box because we had that six[-]foot distance between the Prosecution, the witness, and anyone in the juror box. So the only way that could even be feasible was during opening statement or closing argument.

Roper contends that this was a concession by the People that one person could have been placed in the jury box during opening statements and closing arguments, and thus the court did not take "every reasonable measure to ensure public attendance."

¶ 36 First, we disagree that this was a concession by the People. It was said in passing, as the prosecutor was arguing that the closure was *proper*. Moments later, the same prosecutor unequivocally stated that "it was just not possible" to accommodate the public in the courtroom. Moreover, taking the prosecutor's words at face value, at most it was a concession that placing a single person in

16

the jury box for only those portions of the trial was *feasible*, not that it was *reasonable*.

¶ 37    In its written order, the trial court enumerated most of the People's assertions from the hearing and then found that they were accurate and adopted and incorporated them into the record.  The court did not explicitly adopt the People's assertion that it was feasible that a member of the public could have been in the courtroom during opening statements and closing arguments. Rather, the court described the layout and dimensions of the courtroom where Roper's trial took place, including that counsel tables were moved to the outer edges of the courtroom in order to allow for six-foot distancing to the lectern, the prosecution's table touched the jury box, the jury box measured six feet, four inches from the wall to the front railing, and the witness stand was only four feet, ten inches from the jury box railing.  Given these findings, it is far from clear that the trial court agreed with the People's assertion that someone could have been seated in the jury box during opening statements and closing arguments, while complying with social distancing requirements.  Moreover, nothing in the

17

record other than the single remark made by the prosecutor demonstrates that this was possible.

¶ 38    In any event, it is clear from the hearing transcript that no one — not the prosecutor, not the judge, not even defense counsel — treated the prosecutor's remark as a concession that putting a single member of the public in the jury box solely during opening statements and closing arguments would have been a *reasonable* alternative. *See United States v. Veneno*, 94 F.4th 1196, 1206 (10th Cir. 2024) (concluding that although the district court could possibly have made room for a few members of the public by rearranging the juror seating, doing so was not necessarily reasonable at the height of the pandemic). Nor did Roper argue to the trial court that allowing a single member of the public to sit in the jury box only during opening statements and closing arguments was a reasonable alternative to the closure. Thus, being made for the first time on appeal, we decline to consider the contention now. *See People v. Greer*, 262 P.3d 920, 930 (Colo. App. 2011) (declining to review an alleged constitutional error first raised on appeal where "the record may not be complete and the trial court was not afforded an opportunity to rule").

## ii. Jury Selection Courtroom

¶ 39 Even assuming that the larger jury selection courtroom was available for Roper's trial, we reject Roper's contention that because the jury selection courtroom could fit twenty-two prospective jurors in the gallery and in the jury box, at least one member of the public could have been in the courtroom during trial. After detailing the layout of the courtroom that was used for Roper's trial, the trial court found that the jury selection courtroom was only five feet deeper and six feet wider than the courtroom used for Roper's trial, and the extra five feet of depth was from the front of the jury box to the gallery railing. In other words, the gallery in the jury selection courtroom was not significantly larger. Given these findings, had the jury selection courtroom been arranged for trial in a similar manner as the courtroom that was used for Roper's trial, in order to accommodate for social distancing, it still does not appear that someone from the public could have been in the larger courtroom during trial. Moreover, Roper failed to argue to the trial court that this was a *reasonable* alternative, and being made for the first time on appeal, we again decline to address it. *See id.*

### iii. Delay

¶ 40 We continue to reject the argument that delay was a reasonable alternative. As we noted in the order of limited remand, the trial court began by considering and rejecting Roper's request for another continuance. *Roper,* ¶ 21. The court noted that the offense was a sex offense (and thus M.G. had the right to object to further delay) and that the case was "getting on to be two years old." *Id.* Thus, the court found that another continuance was not appropriate. *Id.* We reiterate that under the circumstances, and based on the court's specific findings, we agree with the trial court.

¶ 41 Nor is Roper's argument that the trial court deviated from the Jury Trial Resumption Plan's directive that only one felony trial would take place at a time availing. As noted, it was determined that two trials could safely take place in the courthouse as long as the jury pools for each respective trial remained on opposite sides of the courthouse.

¶ 42 In short, the trial court concluded that the public could not be accommodated and that Roper's proposed alternatives were not reasonable. These findings have record support. As such we will not disturb them. Therefore, we conclude that the supplemental

*Waller* findings are adequate to support the closure and thus turn to Roper's other appellate contentions. *See Veneno*, 94 F.4th at 1206 (concluding that the trial court made adequate *Waller* findings, relying on a similar jury trial resumption plan, to justify a similar closure).

### 3.   First Amendment Public Trial Right

¶ 43    Roper also contends that the public's and press's First Amendment public trial right was violated because they did not have actual access to the proceedings due to the closure and the limitations of the livestream with respect to (1) allowing the viewing audience to see Roper; (2) displaying to the viewing audience the surveillance videos being viewed in the courtroom; and (3) ensuring that the detective could be heard when he moved away from the microphone.  He also contends that requiring jurors and himself to wear masks further exacerbated the public's actual access to the trial and its ability to view it.  The People contend that Roper lacks standing to bring these claims.  We agree with the People.

¶ 44    Roper cites no authority for the proposition that the right of the press and public is any broader than a defendant's public trial right.  Nor has he shown that he has standing to enforce such a

right. He has cited no case, nor are we aware of any, in which a defendant brought a violation of the First Amendment public trial right claim on behalf of the public or press. *See City of Greenwood Village v. Petitioners for Proposed City of Centennial*, 3 P.3d 427, 439 (Colo. 2000) ("The third-party standing rule prevents a party from asserting the claims of third parties who are not involved in the lawsuit."). We therefore do not decide these contentions. *See Boudette v. State*, 2018 COA 109, ¶ 13 ("Standing is a threshold issue that must be satisfied in order to decide a case on the merits." (quoting *Ainscough v. Owens*, 90 P.3d 851, 855 (Colo. 2004))).

## III. Face Mask Requirements

¶ 45 Roper contends that requiring jurors to wear face masks impeded face-to-face interactions and gave jurors a "sense of anonymity," generally alluding to a violation of his public trial right, right to confrontation, right to challenge jurors, and due process rights. Roper also contends that the trial court erred by denying his request that the prosecutor provide him with a clear mask and that this denial violated his right to confrontation. We reject both contentions and discern no constitutional violation.

### A. Standard of Review and Applicable Law

¶ 46    "We review de novo whether a Confrontation Clause violation, or other constitutional violation, occurred." *People v. Garcia*, 2022 COA 144, ¶ 13.

¶ 47    "A trial court's management of the courtroom is . . . reviewed for an abuse of discretion." *Id.* at ¶ 14. "An abuse of discretion occurs when the trial court's decision is manifestly arbitrary, unreasonable, unfair, or based on an erroneous understanding of the law." *Id.*

¶ 48    "The Sixth Amendment to the United States Constitution and article II, section 16 of the Colorado Constitution provide criminal defendants with the right to be confronted with the witnesses against them." *People v. Hernandez*, 2021 CO 45, ¶ 19. Generally, confrontation rights include the right to the physical presence of a witness, testimony of the witness under oath, cross-examination of the witness, and observation of the witness' demeanor. *Id.*

### B. Analysis

#### 1. Requiring Jurors to Wear Face Masks

¶ 49    After Roper filed his opening brief a division of this court held that a requirement that prospective and impaneled jurors wear

masks during jury selection and at trial during the COVID-19 pandemic did not raise constitutional concerns. See Garcia, ¶¶ 16-26. In Garcia, the division concluded that a defendant can still assess a juror's credibility and demeanor during voir dire and trial while the juror is wearing a face mask. Id. at ¶ 20. Moreover, the division stated that it was aware of no authority holding that defendants have a constitutional right to see jurors' uncovered facial expressions during trial. Id. at ¶ 21. And Roper cites no such authority. Nor does he respond to the People's argument that we should follow Garcia and reject his claims. We consider *Garcia* to be well reasoned and follow it here.

### 2. Roper's Request for a Clear Mask

¶ 50 Before the trial resumed on the second day, defense counsel asked the trial court to order the prosecution to provide Roper with a clear mask because defense counsel was unable to obtain one. The trial court denied the request, stating that it was up to defense counsel to provide his client with a clear mask. The record is unclear as to whether the prosecutor provided a clear mask to Roper. But even assuming that Roper did not wear a clear mask

during trial, we discern no error in the trial court's ruling or any constitutional violation stemming from that ruling.

¶ 51    As noted, the Jury Trial Resumption Plan provided that "[a]ttorneys may provide clear masks for themselves and their clients, as well as for witnesses to use during their testimony." The trial court denied Roper's request in accordance with the Jury Trial Resumption Plan, and we discern no abuse of discretion in doing so. Indeed, had defense counsel provided Roper with a clear mask so the jurors could see his face, it would have obviated the issues he now raises. In other words, the trial court did not deprive Roper of the opportunity to allow the jurors to see his full face. Further, this denial, which purportedly resulted in Roper not wearing a clear mask, did not violate Roper's confrontation right. *Cf. Garcia*, ¶ 32 (concluding that the limitation on some jurors' ability to see the defendant's entire face during the trial, because they were seated in the gallery due to COVID-19 spacing requirements, did not violate the defendant's right to confrontation).[3]

---

[3] Roper also asserts, without citing authority or developing an argument, that the trial court's denial of his request for a clear mask violated "his due process right to a fair trial generally." We do

25

## IV. Sufficiency of the Evidence

¶ 52    Roper contends that there was insufficient evidence to convict him of sexual assault (victim helpless) and sexual assault (victim incapable of appraising the nature of her conduct). We disagree.

### A. Standard of Review

¶ 53    "[W]e review the record de novo to determine whether the evidence before the jury was sufficient both in quantity and quality to sustain the convictions." *Dempsey v. People*, 117 P.3d 800, 807 (Colo. 2005). We view the evidence as a whole and in the light most favorable to the prosecution to determine whether the evidence was "sufficient to support the conclusion by a reasonable mind that the defendant was guilty beyond a reasonable doubt." *People v. Griego*, 2018 CO 5, ¶ 24. In doing so, we give the prosecution "the benefit of every reasonable inference which might be fairly drawn from the evidence." *People v. Perez*, 2016 CO 12, ¶ 25 (quoting *People v. Gonzales*, 666 P.2d 123, 128 (Colo. 1983)). It is the role of the jury to weigh the credibility of witnesses and to resolve conflicting

---

not consider this "bald legal proposition presented without argument or development." *People v. Rios*, 2020 COA 2, ¶ 7 n.1; *see also* C.A.R. 28(a)(7)(B).

26

testimony. *People v. Poe*, 2012 COA 166, ¶ 14. We may not substitute our judgment for the jury's or reweigh conflicting evidence or witness credibility. *Id.*

## B. Applicable Law

¶ 54    A person commits sexual assault (victim physically helpless) when they "knowingly inflict[] sexual intrusion or sexual penetration on a victim . . . [and t]he victim is physically helpless and the actor knows the victim is physically helpless and the victim has not consented." § 18-3-402(1)(h), C.R.S. 2024. Physically helpless "means unconscious, asleep, or otherwise unable to indicate willingness to act." § 18-3-401(3), C.R.S. 2024.

¶ 55    A person commits sexual assault (victim incapable of appraising the nature of her conduct) when they "knowingly inflict[] sexual intrusion or sexual penetration on a victim . . . [and t]he actor knows that the victim is incapable of appraising the nature of the victim's conduct." § 18-3-402(1)(b). "Subsection (b) addresses the situation in which a victim is cognitively unable to appreciate her conduct; in other words, it involves a victim who simply cannot understand what she is doing." *Platt v. People*, 201 P.3d 545, 548 (Colo. 2009). A victim who is extremely intoxicated may be

incapable of appraising the nature of their conduct. *See People in Interest of J.R.*, 216 P.3d 1220, 1222 (Colo. App. 2009); *People v. Lancaster*, 2022 COA 82, ¶¶ 19-20; *People v. Martinez*, 2020 COA 141, ¶¶ 45-49.

¶ 56    "Subsections (b) and (h) are not mutually exclusive. Instead, the same conduct may, depending on the evidence, violate both sections." *Platt*, 201 P.3d at 548.

## C.    Analysis

¶ 57    Roper contends that there was insufficient evidence to show that M.G. was physically helpless or incapable of appraising the nature of her conduct and that Roper knew she was physically helpless or incapable of appraising the nature of her conduct. We disagree with both contentions.

¶ 58    Roper specifically contends that although M.G. testified that she did not remember anything from that evening, "evidence demonstrated that she appeared conscious, awake, and able to indicate willingness to act," specifically that she appeared awake and conscious before and after the assault. But merely pointing to evidence supporting his defense does not mean that there was insufficient evidence to support the conviction. *See People v. Oliver,*

2020 COA 150, ¶ 6 ("A conviction will not be set aside merely 'because a different conclusion might be drawn from the evidence.'" (quoting *People v. Tumbarello*, 623 P.2d 46, 49 (Colo. 1981))).

¶ 59    Rather, viewing the evidence as a whole and in the light most favorable to the prosecution, and giving the prosecution the benefit of every reasonable inference, we conclude the evidence was sufficient to sustain Roper's convictions for both sexual assault (physically helpless) and sexual assault (victim incapable of appraising the nature of her conduct).

¶ 60    With respect to whether M.G. was physically helpless, the evidence reflected that Roper was with M.G. while she was drinking and witnessed her exhibiting outward signs of extreme intoxication. He knew she had been sent home from the laser tag event. He knew she got even more intoxicated during the Uber drive. *Cf. Martinez*, ¶ 48 (concluding that evidence of the victim's intoxication allowed the jury to infer that the victim was highly intoxicated — and exhibited outward signs of impairment — during her encounter with the defendant). A sorority sister testified that when the group walked in on Roper penetrating M.G., M.G. appeared unconscious. M.G. was unresponsive to the group's yelling and was not moving,

and she could not walk or dress herself. Based on this evidence, the jury could have concluded that she was unconscious during the sexual assault, and that Roper knew she was unconscious. *See J.R.*, 216 P.3d at 1222 (concluding that the evidence was sufficient to support a finding that the victim was physically helpless).

¶ 61 Further, we reject Roper's argument that M.G. was alert and oriented and able to describe what had occurred between her and Roper and thus was not "otherwise unable to indicate willingness to act." There was evidence that M.G. was unable to move on her own immediately following the assault, and a reasonable inference would have been that she could not indicate willingness to act during the assault due to her physical incapacity, and that Roper knew it.

¶ 62 Roper contends that for the same reasons, the evidence was insufficient to convict him of sexual assault (victim incapable of appraising the nature of her conduct). But the same evidence shows that M.G. was unable to appreciate the nature of her conduct, and that Roper knew it. Additionally, the evidence reflected that M.G.'s tampon had not been removed when Roper assaulted her, which further supports the conclusion that she did not understand what she was doing. *See Platt*, 201 P.3d at 548.

¶ 63    In sum, we conclude the evidence was sufficient to convict

Roper of both types of sexual assault.

### V.    Jury Questions

¶ 64    Roper contends that the trial court erred by failing to provide

further guidance to the jury in its answers to two jury questions.

We agree with the People, however, that Roper waived this

contention.

¶ 65    During deliberation, the jury sent two questions to the trial

court:

> (1)    "We would like further explanation of 'unable to indicate
>
> willingness to act;'" and
>
> (2)    "Is there any further legal definition of incapable of
>
> appraising the nature of conduct?"

¶ 66    The prosecutor requested that "the Court should instruct

them that they have all of the instructions of law that they will be

provided related to this."  Defense counsel responded,

> Generally, I agree with that.  I think the
> language I have seen as you had been provided
> the legal definitions for all words which have a
> legal definition, and either leave it at that, or
> then I think there's some case law that
> suggests if they keep asking or if they're not
> sure that this common usage is something

that's been tested by appellate courts. So I think we're in accord, generally; how to phrase it specifically, I'd defer to the Court. But I think they've been given what they can and they need to apply common usage for those that they don't have a definition for.

The trial court asked, "That's if they persist in asking for direction?" And defense counsel responded, "I think that's right." The trial court then said, "Okay. My thought would be this. This verbiage would be, you've been provided the legal definition for all words that have a legal definition." After discussing the second juror question, defense counsel agreed with the prosecutor that the court should answer this question the same way it planned to answer the first.

¶ 67 Roper waived any challenge to the sufficiency of the trial court's answers to the two jury questions by affirmatively agreeing with the answer to both. *See People v. Dunlap*, 124 P.3d 780, 817 (Colo. App. 2004) ("When a defendant actively participates in the preparation of a response to the jury, or expressly agrees to it, he or she is prevented from asserting error with respect to that response."). Accordingly, we will not consider this claim. *See Rediger v. People*, 2018 CO 32, ¶ 40 ("[W]aiver extinguishes error, and therefore appellate review . . . .").

## VI. Constitutionality Challenges to Statutes

¶ 68    Finally, Roper lodges facial and as-applied challenges to the constitutionality of three statutes. In particular, he contends that (1) section 18-3-402(1)(h) (sexual assault where the victim is physically helpless) is unconstitutionally vague both on its face and as applied to him; (2) section 18-3-402(1)(b) (sexual assault where the victim is incapable of appraising their own conduct) is unconstitutionally vague as applied; and (3) the voluntary intoxication statute is unconstitutional both facially and as applied.

¶ 69    Roper concedes that none of his constitutional challenges was preserved. While we generally do not address as-applied challenges that are not presented to the district court, we may do so in the interest of judicial economy and where, despite the lack of an objection, the record is sufficient to do so. *People v. Price*, 2023 COA 96, ¶ 47. Roper urges us to consider his claims and assures us that we have a sufficient record to do so. We agree the record is sufficient and accordingly, we exercise our discretion to address his claims. In doing so, we reject them.

¶ 70    Because each of the claims was unpreserved, we review each claim for plain error. *Hagos v. People*, 2012 CO 63, ¶ 14. To be

plain, an error must be obvious, meaning that it "contravene[d] a clear statutory command, a well-settled legal principle, or established Colorado case law." *People v. Crabtree*, 2024 CO 40M, ¶ 42. Roper points to no such command, principle, or case law in existence at the time of trial for any of the three statutory provisions he now attacks. To the contrary, two of the three provisions have been explicitly held to be *constitutional*. *See People v. Gross*, 670 P.2d 799, 801 (Colo. 1983) (holding that the provision regarding sexual assault when "the actor knows that the victim is incapable of appraising the nature of the victim's conduct" was not unconstitutionally vague); *People v. Stone*, 2020 COA 23, ¶ 20 (rejecting a constitutional challenge to the voluntary intoxication statute).

¶ 71 Because Roper does not identify any obvious error, his constitutional challenges must fail.

VII. Disposition

¶ 72 The judgment is affirmed.

JUDGE BROWN and JUDGE SCHOCK concur.